**BUFFALO MARINE SERVICE, INC., Appellant,**

v.

**Richard MONTEAU and Genevieve Monteau, Appellee.**

No. C14–86–00750–CV.

Court of Appeals of Texas, Houston (14th Dist.).

Oct. 27, 1988.

Robert L. Klawetter, William M. Woodruff, Houston, for appellants.

K. Michael Mayes, Conroe, Carol H. Sloss, Houston, for appellees.

Before JUNELL, SEARS and DRAUGHN, JJ.

## OPINION

DRAUGHN, Justice.

This is an appeal from a judgment awarding damages for the sinking of a shrimp boat during Hurricane Alicia. Following a nonjury trial, the court awarded appellees Richard and Genevieve Monteau the fair market value of the vessel, the cost of raising it and attorney's fees. Appellant Buffalo Marine Service, Inc. argues that the trial court erred as follows: in applying the wrong standard to judge Buffalo Marine's conduct; in finding Buffalo Marine negligent and such negligence a proximate cause of the sinking; in failing to find that the Monteaus were negligent; in awarding attorney's fees; and in applying the wrong measure of damages. The Monteaus filed a cross-appeal seeking reformation of the judgment to include the commission paid to sell the boat for salvage and the costs related to the bill of sale. They also seek recalculation of the prejudgment interest award and remand on the limited issues of recovery of damages for mental anguish and lost profits. We find error in the award of attorney's fees, and we modify the judgment to delete those fees. Additionally, we find error in the calculation of prejudgment interest, and we reform the judgment to reflect the correct amount to be awarded. As modified and reformed, we affirm the judgment of the trial court.

The factual record reflects that Richard Monteau began shrimping in 1949. In 1954 he became a partner in the MISS GEN with his uncle and in 1960 bought the boat from his uncle's widow. He continued shrimping but occasionally took jobs on towboats and seismograph boats. In 1979 he went to work for Otis Engineering as the captain of a jack barge and retired from there at age sixty-two in 1986. Monteau kept the MISS GEN in operation throughout his tenure at Otis and intended it to be a source of income when he retired. The MISS GEN is a 40–foot long wooden-hulled boat that was built in 1948 and is berthed at Port Bolivar.

On August 17, 1983, as Hurricane Alicia approached the Texas coast, Monteau and his son-in-law sought shelter for the MISS GEN near Brady Island in the Houston Ship Channel. Around 11:00 a.m. they asked for and received permission to tie the boat off to the MIDNIGHT MAGIC, a steel-hulled shrimp boat. The MIDNIGHT MAGIC was in turn tied off to a steel tank barge, the BUFFALO 84, which was owned by appellant Buffalo Marine Service. The barge was loaded with 7000 barrels of fuel oil and was marked with both a red flag denoting hazardous cargo and a warning sign. Monteau testified that he told a deckhand on the BUFFALO 84 that there should be more lines securing the barge to the pilings; however, he foresaw no danger to his boat. Later that day the SAN BLAS, a tug owned by Buffalo Marine, was also moored to the stern of the BUFFALO 84.

The wake of the storm produced a major tidal surge, the water level rose dramatically, and the BUFFALO 84 began to slip her moorings. The captain of the NANNY FRAN, another shrimp boat tied to the barge, pulled the bow of the barge toward the CITY OF PENSACOLA, a barge moored across the bayou some thirty-five to forty feet from the MISS GEN. He then tied a line from his vessel to the PENSACOLA. Several hours later, a deckhand on the tug SAN BLAS attempted a similar maneuver with the stern of the BUFFALO 84 and, in the process, caught the MISS GEN between the MIDNIGHT MAGIC and the PENSACOLA. The MISS GEN was damaged and sank.

Monteau had the boat raised but later sold it, deciding that he could not afford to return it to its previous condition. He then sued Buffalo Marine, alleging that the negligence of that company's employees was the proximate cause of the sinking. Following a non-jury trial, the judge entered findings of fact and conclusions of law to the effect that Buffalo Marine was negligent, and he awarded the Monteaus damages in the amount of $72,200, plus interest and attorney's fees.

In the first of ten points of error, Buffalo Marine asserts that the trial court erred in judging its conduct by a negligence standard. Buffalo Marine argues that the MISS GEN's status was that of a trespasser or, at best, a mere licensee, and that the only duty owed to the Monteaus was not to willfully or wantonly injure them. *Baldwin v. New York Cent. R.R.*, 87 F.Supp. 562, 564 (E.D.N.Y.1949). We agree with this statement of the law; however, we do not agree that it applies in this case.

First, we find that the MISS GEN was not a trespasser. An entry upon the land of another may be justified by necessity. *Ploof v. Putnam*, 81 Vt. 471, 71 A. 188, 189 (1908). Richard Monteau testified that he heard the storm was coming in near Galveston and decided to move his boat away from the coast. Many barges and other shrimp boats were already tied up along the channel, which was filling with debris, so Monteau and his son-in-law continued inland. A friend told him to go to Brady Island where he was permitted to tie up alongside the MIDNIGHT MAGIC, which was tied to the Buffalo Marine barge.

Several witnesses testified that in the event of a storm, it is a common and accepted practice for a boat owner to take his boat to a safer mooring. Indeed, Patrick Studdert, the president of Buffalo Marine, stated that he did not consider such people trespassers. Monteau testified he thought this location was the safest place to tie up his vessel, particularly as other boats were already there. He did not recall having seen the red flag or the warning sign. Also, no one from Buffalo Marine, the barge or the tug told him he was trespassing and should move. We therefore conclude that necessity forced Monteau to seek shelter at the Buffalo Marine facility and that he was not a trespasser.

If the MISS GEN was instead a mere licensee, then the question is whether Buffalo Marine owed her only a duty not to injure her willfully and wantonly. While the willful and wanton rule is well settled in this state, there are exceptions. Under one such exception, a licensee has the right to require of the occupier of the premises that he conduct himself so as not to injure the licensee through the occupier's active negligence. *Martinez v. Martinez*, 553 S.W.2d 211, 215 (Tex.Civ.App.—Tyler 1977, no writ); *see also Burton Construction & Shipbuilding Co. v. Broussard*, 154 Tex. 50, 273 S.W.2d 598, 602 (1954). Active negligence denotes some positive act. 65 C.J.S. *Negligence* § 1(14) (1966). Buffalo Marine's conduct, through its deckhand on the tug SAN BLAS, comes well within the meaning of that term. The uncontradicted eyewitness testimony is that when the deckhand attempted to maneuver the stern of the BUFFALO 84 away from the pilings, he did so without warning and at a high rate of speed. Monteau thus had no time to move the MISS GEN out of the way. The testimony further shows that the barge was not in immediate danger and that there was sufficient time to allow the MISS GEN to move.

Active negligence does not result in liability, however, unless the licensor was, or in the exercise of reasonable care should have been, aware of the presence of the licensee in a place where he might be injured. 65 C.J.S. *Negligence* § 63(36) (1966). It is clear that Buffalo Marine employees knew of the presence of the MISS GEN. When asked if he saw the MISS GEN come in and tie off to the MIDNIGHT MAGIC, Pat Studdert stated that he "was there when she was there." Also, Steve Malone, a marine supervisor employed by Buffalo Marine, testified that Alex Faddaof, the deckhand, knew the two shrimp boats were there. We conclude, therefore, that the trial court was correct in judging Buffalo Marine's conduct by a negligence standard.

Also supporting the trial court's judgment is a general collision rule that is applicable in this case. When a vessel under its own power collides with an anchored vessel or a navigational structure, the burden of proving absence of fault or *vis major* rests on the pilot vessel. *City of Boston v. SS. Texaco Texas*, 773 F.2d 1396, 1398 (1st Cir.1985); *see also The Oregon*, 158 U.S. 186, 197, 15 S.Ct. 804, 809, 39 L.Ed. 943 (1895). As will be evident in our

discussion of the second point of error, Buffalo Marine failed to carry this burden. Point of error one is overruled.

■ In point of error two, Buffalo Marine argues that the trial court erred in failing to find, notwithstanding the great weight and preponderance of the evidence, that the sole proximate cause of the sinking of the MISS GEN was an act of God. After reviewing all of the evidence as required by this type of insufficient evidence complaint, we disagree. *See Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). To prevail with such a defense, one must show that the storm constituted an act of God; further, the one relying on the defense must show that he was guilty of no negligence that contributed to the damage in issue. *Valley Line Co. v. Musgrove Towing Service*, 654 F.Supp. 1009, 1011–12 (S.D.Tx.1987).

■ No one disputes that Hurricane Alicia and the accompanying unprecedented tidal surge constitute an act of God. However, the Monteaus cite Buffalo Marine's inadequate preparation for the storm, the absence of a captain on board the SAN BLAS, the lack of warning and the incautious maneuvering of the barge as negligent acts that contributed to the sinking of the MISS GEN. There was considerable debate at trial whether the mooring of the barge was sufficient; whether a captain was required to be on board when the tug moved the barge; and whether the moving of the barge was even necessary. Eyewitness accounts of the actual maneuvering of the barge, however, provide strong evidence of negligence.

Monteau testified that at the time of the accident everything was "riding fine." The storm was west of Houston, having already blown over the channel. Several hours earlier, the NANNY FRAN had moved the bow of the barge, going very slowly and taking thirty to forty minutes to perform the maneuver. Monteau and his son-in-law were sitting in the wheelhouse when he saw the SAN BLAS moving in reverse at about three-quarter speed. He went out on deck and started yelling for the pilot to go ahead on his engines, but the tug kept coming. Only when the boats made contact did the pilot put the tug in gear and stop it. Monteau testified that there was no sudden emergency requiring that the barge be moved and that he was given no warning nor was he asked to move his boat.

This testimony was corroborated by David Lambert, the son-in-law, and by Carroll White, the owner of a trawler, the JASHCO, which was tied up to the New Park Shipyard at Brady Island. White stated that the storm had passed over during the night and by the next morning was more or less done. He also testified that the barge was in a steady, safe position and did not ever begin to drift or move on top of the pilings. White's account of the tug's maneuver is a graphic one.

> He tied the towboat to the barge and just started backing up on the engines as hard as he could, for some unknown reason. He never notified nobody that he was going to move the barge or nothing. You know, no notification or nothing. He just started backing up. And Mr. Monteau and Junior Nockwin, the man on the NAN FRAN, and the man on the MIDNIGHT MAGIC was standing on the back deck just a hollering and screaming. And the man just looked at them like he was—like Mr. Monteau was nuts. He was hollering and screaming, Mr. Monteau was, to stop. And he just kept backing harder, just as hard as he could. And he never slowed the engines down. And that boat hit that barge over there, that big seagoing barge and just crushed his boat.

No eyewitness disputed the speed or the lack of warning, though several witnesses testified as to the impossibility of the tug's reaching that speed that fast. Regardless, there was no warning, and we conclude that the evidence is sufficient to show negligence on the part of Buffalo Marine and insufficient to prove Buffalo Marine's act of God defense. Point of error two is overruled.

Points of error three, four and five concern whether the Monteaus' negligence was a proximate cause of the sinking of the

MISS GEN and, thus, whether the trial court erred as a matter of law in failing to assess damages based upon the comparative fault of the parties in accordance with the provisions of maritime law. Buffalo Marine argues that the trial court's failure to find this proximate cause issue was error as a matter of law and was against the great weight and preponderance of the evidence. The company cites as negligent acts Richard Monteau's remaining tied to the BUFFALO 84 despite his "admission" that he thought the mooring of the BUFFALO 84 was inadequate; the Monteaus' failure to secure adequate dockage for their vessel in Port Bolivar; and Monteau's inaction when the barge broke free.

 The trial court made a finding of fact that neither Richard nor Genevieve Monteau was negligent nor was any negligence alleged against them a proximate cause of the occurrence. Findings of fact are reviewable for legal and factual sufficiency challenges by the same standards as those applied in reviewing legal or factual sufficiency challenges to a jury's answer to a special issue. *Buzbee v. Castlewood Civic Club*, 737 S.W.2d 366, 368 (Tex.App.— Houston [14th Dist.] 1987, no writ). To determine a "no evidence" or "matter of law" point, this court must disregard all evidence contrary to the trial court's finding, and if there is any evidence remaining to support it, the finding must be upheld. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 696–97 (Tex.1986). In deciding a "great weight" point, we must consider and weigh all the evidence. *In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951).

 Monteau testified that there were three lines securing the barge to the pilings and that he told the deckhand on the SAN BLAS that he (the deckhand) ought to put more lines out. Although Monteau thought the barge would slip its lines if the water rose too high, he did not feel that the shortage of lines presented any danger to the MISS GEN. As he stated at trial, "No, I didn't think it was any danger. They had, I guess it was a inch and a half lines, I imagine. So it was plenty strong." Also,

he was reluctant to leave the mooring and get back out into the debris-filled channel.

Buffalo Marine argues that the Monteaus believed the MISS GEN faced certain destruction at its berth on Bolivar Peninsula and that it was their failure to secure adequate dockage there for their vessel that sent her "sailing in harm's way." However, we must assume that in making his finding the trial judge agreed with Monteau's concern when the latter heard the storm was coming in near Galveston and sought shelter, as did many others, away from the coastline. Buffalo Marine also faults the Monteaus for not getting underway and allowing the SAN BLAS maneuvering room when the barge "broke free." Yet the testimony is clear that the Monteaus were given no warning nor were they asked to move their boat. We find, therefore, that the evidence supports the trial court's finding of fact, and we overrule points of error three, four and five.

In points of error six through nine, Buffalo Marine attacks the damage award. The company complains that the court incorrectly applied the standards for calculating damages in a maritime cause; that there was no evidence and/or insufficient evidence to prove that the fair market value of the MISS GEN on the date of sinking was $80,000; that the court erred in failing to find that the fair market value was instead $20,000; and that the court erred as a matter of law in awarding damages when the Monteaus failed to sustain their burden of proving what those damages were.

 The measure of damages in a collision case is succinctly stated in *Zanzibar Shipping, S.A. v. Railroad Locomotive Engine Number 2199*, 533 F.Supp. 392 (S.D.Tx.1982). The plaintiff is entitled to that amount of damages which will put him in as good a position pecuniarily as if his property had not been destroyed. Losses are classified in three ways—total, constructive total and partial. A loss is deemed total when the ship is lost, and the measure of damages is the market value, if there is one, of the vessel lost. A loss is deemed constructive total when the cost of

repairs exceeds the ship's value, and the measure of damages is the ship's value at the time of collision less salvage. Any other loss is deemed partial, and the measure of damages is the reasonable value of repairs plus demurrage occasioned by the time taken to complete the repairs. *Zanzibar Shipping*, 533 F.Supp. at 394.

 The trial court made the following findings of fact regarding the damages to the MISS GEN:

10. The damages sustained by the MISS GEN rendered the MISS GEN a total loss, actually and/or constructively.

11. The reasonable and fair value of the MISS GEN immediately prior to the occurrence in question was $80,000.

12. The Plaintiffs incurred and sustained reasonable and necessary costs for raising of the boat in the amount of $10,200.

 · · · · ·

14. The salvage value of the boat was $18,000.

15. The MISS GEN was not repairable following the occurrence in question and/or was not repairable to its condition immediately prior to the occurrence in question.

16. The reasonable and necessary repair costs required to return the MISS GEN to its pre-occurrence condition exceeded the value of the boat immediately prior to the occurrence in question.

17. The reasonable and necessary repair costs required to return the MISS GEN to its pre-occurrence condition, and the reasonable and necessary reclamation expenses, exceeded the value of the boat immediately prior to the occurrence in question.

18. The repairs to the MISS GEN following the occurrence in question did not return the MISS GEN to its condition immediately prior to the occurrence in question.

The court then awarded the Monteaus damages in the amount of the boat value less the salvage value ($80,000 minus $18,000 equals $62,000) plus the costs of raising the boat ($10,200).

Buffalo Marine argues that the Monteaus' loss was a partial rather than a constructive total one. Thus we must examine the evidence concerning values and repair costs. Several people testified as to the fair market value of the MISS GEN on the date of sinking. Richard Monteau gave a range of $80,000 to $90,000 in his trial and deposition testimony. Ronnie Hornbeck is a retired shrimper and friend of Monteau who is building some docks and a wholesale seafood dealership in Port Bolivar. He valued the boat in the $80,000 range. He also stated that at the time the Monteaus lost their boat, there was a large demand for shrimp boats and thus values were high. His brother, who owns another wholesale dealership, put the value at $75,000. Still other testimony ranged from $70,000 to $80,000. In contrast, John Kingston, the marine surveyor employed by the insurance company to make a damage survey of the MISS GEN, valued the boat at $20,000. Furthermore, he described the market for shrimp boats at the time of the sinking as "very soft," meaning there was not much demand for the boats.

As neither set of witnesses was completely impartial, we must rely on the trial judge who had the responsibility to weigh the evidence and judge the credibility of the witnesses. *Glassman and Glassman v. Somoza*, 694 S.W.2d 174, 178 (Tex.App.—Houston [14th Dist.] 1985, no writ). To reiterate, he found that the reasonable and fair value of the MISS GEN immediately prior to the accident was $80,000. There was evidence to support the trial judge's finding, and we decline to overrule his decision.

 Regarding the cost of repairs to the boat, Monteau testified that he talked to two carpenters at the shipyard where the MISS GEN was taken after it was raised. One estimated that it would cost $45–55,000 to get the boat back in "pretty good shape" although it would never be the same. The second estimated $55–60,000. John Kingston, on the other hand, estimated the cost at $15,700 to put the boat in condition to go shrimping.

The difficulty of arriving at a standard for calculating damages in this case is compounded by the fact that once the Monteaus saw the condition of the MISS GEN, they decided not to repair it because they could not afford to put it back in its prior condition. (The boat was not insured at the time of the accident because the insurance costs were too high.) Therefore, they did not attempt to get repair bids but rather sold the boat for $18,000. The new owner could not recall the cost of the repairs to the MISS GEN but estimated the total cost of outfitting it at $30,000. Although it was put back in the water at "the end of September, first of November" [sic], it was spring before the boat was fully operational. Furthermore, Monteau testified that he saw the boat after it was repaired and that it was in much worse condition than when he owned it. The bulwarks were still cracked, the wheelhouse was never fixed, and the boat leaked continuously.

Although the witnesses disagreed about the damage to the MISS GEN, the trial court apparently concurred with Monteau, who testified that the boat could never be repaired to its previous condition. This testimony was seconded by that of Carroll White, who stated that the MISS GEN was no good as a shrimping boat after it was sunk. "It wouldn't have been any good any more. A wooden boat, once you've done that to them." The point is that an injured shipowner is entitled to be placed in the same position he occupied before the collision. If repairs are made, then the damages assessed should be sufficient to restore the vessel to the condition in which she was at the time the collision occurred. *Tug June S v. Bordagain Shipping Co.*, 418 F.2d 306, 307 (5th Cir.1969). The trial court determined that the MISS GEN could not be restored to its previous condition and deemed it a constructive total loss. Based on the evidence, we agree.

■ Buffalo Marine also disputes the finding that the reasonable and necessary cost of raising the boat was $10,200. There was evidence that the person who salvaged a Buffalo Marine barge holed during the same storm offered to salvage the

MISS GEN for $5,000. However, Monteau testified that at the time of the offer he had already hired someone. The job was done with air bags and took approximately one week. We conclude that there was sufficient evidence to support this finding, as well as the others at issue, and we overrule points of error six through nine.

■ In its final point of error, Buffalo Marine argues that the trial court erred as a matter of law in awarding attorney's fees (based on equity and justice) to the Monteaus. The general rule in admiralty cases is that attorney's fees are not awarded. *Platoro Ltd., Inc. v. Unidentified Remains of a Vessel*, 695 F.2d 893, 905 (5th Cir.1983), *cert. denied* 464 U.S. 818, 104 S.Ct. 77, 78 L.Ed.2d 89 (1983), citing *Noritake Co. v. M/V Hellenic Champion*, 627 F.2d 724, 730 (5th Cir. 1980). There are two exceptions to this rule. *Noritake*, 627 F.2d at 730–31. The first exception allows attorney's fees to an indemnitee as against his indemnitor as part of the reasonable expenses incurred in defending against the claim. Such is not the case here. The second exception allows the *discretionary* award of attorney's fees in admiralty cases when the nonprevailing party has acted in bad faith in the litigation. *Noritake* makes clear that the discretion arises only when bad faith is alleged, and none was alleged here. Thus the trial court's award of attorney's fees based on equity and justice cannot stand. We therefore sustain point of error ten and modify the judgment to delete the award of attorney's fees.

■ The Monteaus bring five cross-points on appeal. In cross-point one, they maintain that the trial court erred in concluding they were not entitled to damages for lost profits as a matter of law. Lost profits are recoverable in cases involving a partial loss; however, they are not recoverable when a ship is a total loss. *The Umbria*, 166 U.S. 404, 421–22, 17 S.Ct. 610, 617, 41 L.Ed. 1053 (1897); *A & S Transportation Co. v. Tug Fajardo*, 688 F.2d 1, 2 (1st Cir.1982). This rule has also been applied to a case where the vessel was determined to be a constructive total loss. *A & S*

*Transportation,* 688 F.2d at 2. As we have upheld the trial judge's deeming the MISS GEN a constructive total loss, we also sustain his conclusion regarding damages for lost profits. Cross-point of error one is thus overruled.

■ In cross-point two, the Monteaus contend that the trial court erred in concluding they were not entitled to damages for mental anguish as a matter of law. Mr. Monteau testified that after the boat sank, he was not able to sleep well and he worried. Mrs. Monteau's testimony was somewhat more descriptive. She said that her husband was "crushed" and "emotionally broke" by the loss of their boat and was depressed at the time. He could not sleep well, and she had to be the strong one and keep things together. He cannot talk about the incident too much because he gets upset and cries. They are both concerned about their future because Mr. Monteau had to retire from Otis at age sixty-two rather than at sixty-five due to the economic situation, and they no longer have the MISS GEN to depend on for financial security.

In eliminating the physical manifestation requirement in a cause of action for negligent infliction of mental anguish, the supreme court noted the following:

> The problem is one of proof, and to deny a remedy in all cases because some claims may be false leads to arbitrary results which do not serve the best interests of the public. Jurors are best suited to determine whether and to what extent the defendant's conduct caused compensable mental anguish by referring to their own experience.

*St. Elizabeth Hosp. v. Garrard,* 730 S.W. 2d 649, 654 (Tex.1987). Presumably, this same analysis applies when a case is tried before a judge. Our function is to review the legal conclusions drawn from the facts to determine their correctness. *Mercer v. Bludworth,* 715 S.W.2d 693, 697 (Tex.App. —Houston [1st Dist.] 1986, writ ref'd n.r. e.). In this instance, we find that the trial

court's conclusion of law is correct, and the cross-point is overruled.

In cross-point of error three, the Monteaus complain that the trial court erred in its calculation of the prejudgment interest award. Relying on *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985), the Monteaus argue that they are entitled to prejudgment interest of ten percent per annum, compounded daily rather than six percent per annum. They further argue that prejudgment interest should be calculated on the total damage award rather than on damages excluding attorney's fees. As we are disallowing the award of attorney's fees, the latter argument is moot.

■ The six percent rate of interest set forth in TEX.REV.CIV.STAT.ANN. art. 5069–1.03 (Vernon 1987) does not apply here because this case does not involve a fixed sum ascertainable from an account or contract. However, *Cavnar* established a uniform standard for determining the amount of prejudgment interest in all cases where the amount of interest is not controlled by operation of law. *Acco Constructors, Inc. v. National Steel Products Co.,* 733 S.W.2d 368, 371 (Tex.App.—Houston [14th Dist.] 1987, no writ) (see for authorities cited in support of statement). *Cavnar* mandates that prejudgment interest shall accrue at the prevailing rate that exists on the date judgment is rendered according to the provisions of TEX.REV.CIV. STAT.ANN. art. 5069–1.05 § 2 (Vernon Supp. 1988). *Cavnar,* 696 S.W.2d at 554. As the trial judge determined that rate to be ten percent when he set the postjudgment rate, he therefore erred when he awarded prejudgment interest at six percent. We sustain the Monteaus' third cross-point and reform the judgment to reflect that they are entitled to prejudgment interest on $72,200 at the rate of ten percent per annum, compounded daily, from August 18, 1983, to May 28, 1986,[1] in the amount of

---

1. Since neither party raised a point of error contesting this time period, error, if any, has been waived. Tex.R.App.P. 52(a).

$23,117.19.[2]

 In cross-points four and five, the Monteaus argue that the trial court erred in concluding as a matter of law that they were not entitled to damages for bill of sale costs ($70.02) and for commission costs ($1000) incurred in selling the MISS GEN. The Monteaus assert that both of these expenses resulted from the negligence of Buffalo Marine and the accident and are recoverable. However, they offer us no authority for their claim, and we are unable to find other cases in which similar costs were awarded. Therefore, we decline to award such costs here. Cross-points four and five are overruled.

We affirm the judgment of the trial court with the modification regarding the award of attorney's fees and the reformation of the prejudgment interest award.

**2.** This calculation is based upon the following compounded interest formula as set out in *Acco Constructors, Inc. v. National Steel Products Co.,* 733 S.W.2d 368, 371–72 (Tex.App.—Houston [14th Dist.] 1987, no writ):

i = amount of interest

d = damages = $72,200

r = daily interest rate = .10/365

t = number of compounding periods = number of days from August 18, 1983, to May 28, 1986 = 1014

$i = 72,200 (1 + .10/365)^{1014} - 72,200$

$= 95,317.19 - 72,200$

$= 23,117.19$