**FEDERAL LAND BANK ASSOCIATION OF TYLER, Appellant,**

v.

**William C. SLOANE, Lettie Sloane, and Robert C. Sloane, Appellees.**

**No. 12–88–00231–CV.**

Court of Appeals of Texas, Tyler.

May 31, 1990.

Rehearing Denied Aug. 31, 1990.

David M. Bond, Charles T. Newton, Jr., Houston, for appellant.

Blair A. Bisbey, Jasper, for appellees.

RAMEY, Chief Justice.

This appeal arises from the award of damages in an action for negligent misrepresentation. We affirm the trial court's decision as to liability and reform the judgment to reflect the proper award of damages.

Appellees, William C. Sloane, Lettie Sloane, and Robert C. Sloane (hereinafter "Sloanes"), brought suit against appellant, Federal Land Bank Association of Tyler (hereinafter "Bank"), for negligently misrepresenting that the Sloanes' loan application had been approved.

The testimony shows that in March of 1986 the Sloanes approached the Bank's loan officer, David Weeks (hereinafter "Weeks"), about obtaining financing to build at least two chicken houses so that the Sloanes could raise broilers for Pilgrim's Pride (hereinafter "Pilgrim"). On March 7, 1986, the Sloanes, while in the presence of Weeks at the Bank's San Augustine office, completed a financial statement in which Mrs. Sloane inadvertently left two creditors off of the financial statement.

In May of 1986, Weeks orally informed the Sloanes that their loan application had been approved by the Bank's board. In reliance upon Weeks' representation, the Sloanes moved utility lines and had the sites for the chicken houses prepared. When the Sloanes told their general contractor, Sid Coufal of D & B Poultry, that the loan had been orally approved and that they were free to begin work on the site, Coufal stated that it was unusual to start work before the loan papers had been signed, so he contacted Weeks to confirm that the loan had indeed been approved. Weeks told Coufal that the loan had been approved as an "add on" type transaction.[1] Thereafter, in August of 1986 and prior to the beginning of construction on the site, the Sloanes received a letter from the Bank informing them that the loan would not be

---

1. The Bank held the mortgage on the Sloane farm at the time they sought the additional funds to build the chicken houses. The balance on their original mortgage was $47,000 at the time they sought the loan at issue.

approved. They were advised that they could seek a review of the Bank's decision with the credit review committee.

Although the Sloanes did not seek to have the committee review the denial of their loan application, they did unsuccessfully seek to obtain financing elsewhere. Because they were not able to quickly obtain other financing, Pilgrim withdrew its commitment to contract with the Sloanes to raise broilers. Damages alleged by the Sloanes included: (1) marital discord resulting in the separation of Mr. and Mrs. Sloane; (2) treatment for migraine headaches suffered by Mrs. Sloane; (3) inability to make their annual farm mortgage payment due to personal funds invested in the aborted construction project and increased interest rates due to the requirement that the Sloanes refinance their farm mortgage; (4) costs estimated at $15,000 incurred in moving utility lines and having the "dirt work" done to prepare a pad for the chicken house sites; (5) mental anguish suffered by Robert Sloane as a result of the additional financial strain placed upon him due to denial of the loan; (6) loss of 5 acres of pasture land previously used for the growing and harvesting of hay; and (7) lost profits estimated at $12,000 per year for at least five years as a result of losing the contract with Pilgrim.

After hearing the evidence, the Court entered judgment in favor of the Sloanes, and based upon the jury's verdict, awarded $70,000 in damages and $11,974.48 in prejudgment interest.

By its first point of error, the Bank contends that the trial court erred in denying its motion for judgment n.o.v. because the Sloanes were, in effect, suing for breach of an oral contract to loan money, and such contracts are unenforceable under the Statute of Frauds.[2]

The elements necessary to prove negligent misrepresentation are set forth in *Rosenthal v. Blum*, 529 S.W.2d 102 (Tex.Civ. App.—Waco 1975, writ ref'd n.r.e.):

One who, in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

*Id.* 529 S.W.2d at 104 (quoting Tentative Draft No. 12, Restatement of Torts (2nd ed. 1966), § 552 (1977)). Furthermore, it is immaterial whether such misrepresentation was made by accident or intent, since it needs only to have been made and to have been false when made. *Susser Petroleum Co. v. Latina Oil Corp.*, 574 S.W.2d 830, 832 (Tex.Civ.App.—Texarkana 1978, no writ).

It is clear from the Plaintiff's Second Amended Petition that the Bank's denial of the loan is not at issue in the instant case. In fact, the Sloanes concede that the Bank acted reasonably in turning down the Sloanes' loan. Mrs. Sloane testified as follows during trial: "You see, we're not questioning Federal Land Bank turning down our loan ... that's not what we're objecting to." In *Collins v. McCombs*, 511 S.W.2d 745, 747 (Tex.Civ.App.—San Antonio 1974, writ ref'd n.r.e.), the Court held that:

Even if it be conceded that an action in tort [for misrepresentation] is unaffected by the provisions of the Statute of Frauds, the judicial disregard of the statute should be limited to situations in which the essence of the action *truly* sounds in tort [not contract]. (Emphasis ours.)

Where the injury to the subject matter is only the economic loss of the contract itself, the action sounds in contract alone. *Jim Walter Homes, Inc. v. Reed*, 711 S.W.2d 617, 618 (Tex.1986); *Webber v. Kel-*

---

2. Appellant argued to the trial court that there was "no evidence" to support a finding that Weeks supplied "false" information at the time the representations were made, and thus no action for "misrepresentation" could be supported. On appeal, however, no similar sufficiency point was presented. This Court, therefore, is precluded from considering same. *San Jacinto River Authority v. John Thomas Duke*, 783 S.W.2d 209 (Tex.1990).

*logg Co.*, 720 S.W.2d 124, 129 (Tex.App.—Houston [14th Dist.] 1986, writ ref'd n.r.e.).

■ The case at bar is distinguishable from *Reed* and *Webber* because the Sloanes were not seeking to enforce a contract for the loan which they alleged was promised to them.[3] Instead, they sought damages which were the purported result of their reliance upon Weeks' oral representation that the loan had been approved. The cases cited by the Bank in support of its Statute of Frauds argument involve recovery for breach of an unenforceable contract by disguising the true contractual nature of the complaint as a suit for recovery based upon fraud; in these cases the wolf drops his sheep's clothing by seeking damages for breach of contract rather than damages sounding in tort. However, in the case at bar, the Statute of Frauds is clearly inapplicable because the damages sought by the Sloanes are separate and distinct from those which would have been sought had a breach of contract action been pursued. The Bank's first point of error is therefore overruled.

By its second point, the Bank argues that the Sloanes are not entitled to recover for negligent misrepresentation because the representations made the subject of complaint were allegedly induced by the Sloanes' misrepresentations to the Bank.

■ The sole case which the Bank cites in support of this point of error is *Monier v. Guaranty Trust Co. of N.Y.*, 82 F.2d 252, 254 (2d Cir.1936), which stands for the proposition that "any material falsity in the facts asserted existing on that date [the date of the financial statement] would be ground for rescinding a loan made in reliance on the statement, regardless of the borrower's innocence in making the false assertion." Once again, the Bank relies upon its right to rescind the oral agreement to loan money. The fact that the Bank had

the right to refuse the loan does not bar the Sloanes' right to recover for negligent misrepresentation because this is not an action for breach of contract. Furthermore, Ted Conover, the Bank's president, who ultimately made the decision to refuse the Sloane's loan, testified that the fact that the Sloanes failed to include two creditors on their financial statement was not the reason for the Bank's refusal to approve their loan. Thus, even if the reasonableness of the Bank's refusal of the loan were at issue, the *Monier* case would not be applicable.

While it is conceivable that the Sloanes' allegedly inadvertent omissions of debt disclosures to the Bank could have been viewed by the trier of fact as contributory negligence on the part of the Sloanes,[4] the jury specifically found that the Sloanes were not contributorily negligent. The Bank did not raise a point of error challenging the jury's negative finding on that issue; therefore, the issue is not before us. *San Jacinto River Authority v. John Thomas Duke*, 783 S.W.2d 209. The Bank's second point of error is overruled.

In its third through sixth points of error, the Bank contends that there is no evidence, or in the alternative, insufficient evidence to support the jury's award of damages in the amount of $70,000; that the Sloanes are only entitled to recover "out-of-pocket expenses" if any; that "lost profits" are not properly considered a part of out-of-pocket expenses; that lost profits and out-of-pocket expenses are legally inconsistent with each other; and that damages for mental anguish are not recoverable in a negligent misrepresentation case.[5] Since each of these points deals with the recovery of damages, they will be considered together.

---

3. According to testimony, Weeks had represented that the Bank would lend them an additional $104,000 for purposes of building the chicken houses.

4. Contributory negligence is a defense to the cause of action for negligent misrepresentation. Restatement (Second) of Torts, § 552A (1977).

5. In their briefs, both parties cite as authority for their argument an unpublished opinion of this Court. However, TEX.R.APP.P. 90(i) states that unpublished opinions may not be so cited by counsel or court.

In response to Special Issue No. 6, the jury awarded the following damages categorized as follows:

$25,000.00 – *past damages* for monetary losses *other than lost profits*

$1,500.00 – *future damages* for monetary losses *other than lost profits*

$15,000.00 – *past* damages for *lost profits*

$13,500.00 – *future* damages for *lost profits*

$15,000.00 – *past* damages for *mental anguish*

$ –0– – *future* damages for *mental anguish*

——————
$70,000.00

## PAST AND FUTURE DAMAGES FOR MONETARY LOSSES OTHER THAN LOST PROFITS

■ The Bank argues that the evidence did not support the jury's award of "out-of-pocket" damages (past or future).[6] With regard to past out-of-pocket expenses, the undisputed testimony is that Mrs. Sloane borrowed $15,000 to pay for the site preparation for the chicken houses. She testified that $8,500 of this money was paid to a Mr. Birdwell for the dirt work; $1,230 was expended on labor in tearing the old chicken house down according to receipts introduced into evidence; $280.00 was paid to "REA" for moving utility poles, and the total amount of receipts for supplies and equipment rental introduced into evidence totalled $217.03. Furthermore, both Mrs. Sloane and Robert Sloane testified that Robert contributed approximately $1,200 in labor while acting as a foreman/coordinator on the site preparation project but was never paid for these services. Mrs. Sloane testified that she did not have receipts for some of the work done on the site preparation, which receipts were destroyed when their home burned in November of 1986. The aforementioned out-of-pocket expenses are supported by sufficient evidence.

■ There was additional testimony that a trencher was rented to dig utility line trenches, but there was no proof of the amount of this expenditure. Mrs. Sloane also testified that she and her son had purchased a special type of tractor required by Pilgrim to transport a generator for the chicken houses. The Sloanes paid $3,000 down for the tractor but were unable to continue making payments on it; consequently, the vendor took the tractor back and canceled the Sloanes' remaining debt obligation on it. However, Mrs. Sloane admitted that the tractor should not have been purchased at that time, that it had other unspecified and unallocated uses on the farm, and that the Bank had no responsibility for the loss of the tractor and the payments. The Bank timely objected to this testimony about the tractor because it had not been plead as an element of damage claimed by the Sloanes. Therefore, the $3,000 expenditure on the tractor and any installment payments thereon were not out-of-pocket expenses recoverable against the Bank.

■ Although the Sloanes testified that they tore down an older, smaller chicken house in order to build a new one, no value was ever placed on the destroyed chicken house, and testimony with regard to it indicated that it had no real worth. Without proof of the value of the former structure, no amount was recoverable for such past out-of-pocket expenses.

■ Lastly, with regard to past out-of-pocket expenses, Mrs. Sloane testified that as a direct result of the Bank's negligent misrepresentation, she was unable to make the annual payments to the Bank on her farm note which had an interest rate of 11%. She testified that the annual payment was between $6,000 and $7,000, but that they had put the money into the construction project instead of setting it aside for the annual note payment. Although the Bank was lenient with them and allowed additional time to make the payment, Mrs. Sloane testified that they ultimately

6. Although no category entitled "out-of-pocket expenses" was presented to the jury for determination, we assume, for purposes of this opinion, that the Bank is referring to that category of damages (past and future) entitled "damages for monetary losses other than lost profits" which is actually a broader category of recovery than "out-of-pocket expenses." For convenience, we will refer to this category of damages as "out-of-pocket expenses."

refinanced the farm at a different lending institution at 12% interest; furthermore, the new farm loan was payable in full after one year instead of being payable in annual installments. Mrs. Sloane admitted that the Bank offered to refinance the loan but she chose unilaterally to move the loan to the Chireno Bank. Furthermore, there was no attempt to specify the amount of damages suffered by the Sloanes as a result of refinancing the farm note. Thus, there was no evidence to consider the refinancing of the farm note as an out-of-pocket expense, past or future.

■ As to future monetary losses, Robert Sloane testified that it was necessary to bulldoze five acres of pasture land used to grow hay in order to prepare a proper site for the proposed chicken houses. There was no proof of the reasonable cost of restoration of this tract to hay production. Also, Mrs. Sloane testified that she has been treated for migraine headaches due to nerves. However, she did not introduce any evidence with regard to expenses she has incurred in this regard nor attempt to project future medical expenses for treatment of her migraines. Therefore, even if we were to assume that the medical expenses were recoverable, no evidence was introduced to support such a recovery.

Based upon an analysis of the evidence viewed in the light most favorable to the Sloanes, we find that the award for past monetary losses should be reformed to reflect a recovery of $11,427.03 and the jury verdict of $1,500 for future monetary losses is not supported by the evidence. The Bank's third point of error is sustained in the amount of $13,572.97 of the $25,000 jury finding as it relates to the award of past "out-of-pocket" expenses, and sustained as to future expenses.

### PAST AND FUTURE DAMAGES FOR LOST PROFITS

The jury awarded the Sloanes $15,000 in damages for past lost profits and $13,500 in damages for future lost profits. The Sloanes had ceased operations in the poultry business in any form in January, 1984,

over two years before making application for the loan in question. The general rule is that damages for lost profits of a new and unestablished business will be denied. 28 Tex.Jur.3d *Damages* § 177; 22 Am. Jur.2d *Damages* § 627; 28 C.J.S. *Damages* § 42.

■ The Sloanes concede that Texas law does not generally allow recovery of expected profits for an unestablished business; they argue, however, that they are entitled to recover lost profits based on one or both of the following exceptions: (1) the evidence demonstrated that they had successfully operated a poultry operation for a number of years prior to seeking a contract with Pilgrim, and (2) even in the absence of a history of profitability, there is proof of the actual existence of a future contract from which lost profits can be calculated with reasonable certainty. *Allied Bank West Loop v. C.B.D. & Assoc.*, 728 S.W.2d 49, 54–55 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

The Sloanes' poultry business was not an established, on-going business concern. Lettie Sloane testified that they were not in the poultry business when they applied for the loan and had not been for over two years. Several years previously, the Sloanes had fed chickens for a different feeder; there was no attempt to prove that the operations or the contractual arrangement with the prior feeder, Gold Kist, and Pilgrim were similar. In fact, the Sloanes were primarily feeding *pullets* for Gold Kist whereas they would have fed *broilers* for Pilgrim. The operations were dissimilar: Pilgrim refused to consider the Sloanes to become contract feeders unless they removed the standing chicken houses and built much larger houses with entirely different equipment as prescribed by Pilgrim. These requirements necessitated the attempt to secure the financing which resulted in this dispute. This additional financing expense would have significantly altered the Sloanes' prior profit margin, if any, according to John Johnson, Pilgrim's Broiler Production Manager. The Sloanes' prospective feeding arrangement with Pil-

grim was a new and unestablished business.

We next must determine whether there was sufficient evidence to establish the actual existence of a future contract with Pilgrim from which lost profits could be calculated with reasonable certainty. The facts in the *Allied Bank* case upon which the Sloanes rely are briefly as follows: C.B.D. & Associates (hereinafter "C.B.D.") operated an oilfield brokerage business whereby it coordinated the buying and selling of oilfield equipment for which it received a commission. C.B.D. had two bank accounts at Allied Bank West Loop (hereinafter "Allied"). Because of the wrongful acts of Allied, C.B.D. was forced out of business. C.B.D. sued Allied and was awarded damages, including lost profits. Allied appealed and challenged the sufficiency of the evidence to support an award of lost profits. Upon reviewing the sufficiency of the evidence, the court held that in addition to the profits from commissions that C.B.D. had actually made during its operation as a broker, the jury was also entitled to consider as evidence of lost profits a $50,000 commission that C.B.D. would have earned from the sale of pipe to A.I.S. had that sale not been canceled. The court stated that "a party must show either a history of profitability *or* the actual existence of a future contracts from which lost profits can be calculated with reasonable certainty." *Allied Bank West Loop v. C.B.D. & Assoc., Inc., et al.,* 728 S.W.2d at 55. In *Allied Bank,* the sale of the pipe to A.I.S. was a contract to be performed in the future which actually existed and the lost profit was clearly established as being in the liquidated sum of $50,000.

In the instant case, the Sloanes introduced the following evidence in support of their contention that a future contract actually existed:

1. A letter written by John Johnson of Pilgrim which was sent to the Bank and which stated: "I have agreed to feed out broilers to (the Sloanes) once the houses are complete according to Pilgrim's Pride Corporation's specifications with good roads and loading pads. I further state that once the houses are complete that we look forward to many years of successful production of chickens on (the Sloanes') farm."

2. The testimony of John Johnson at trial by deposition:

A. Pilgrim would have entered into a contract with the Sloanes had the necessary construction taken place within the agreed time frame, and that assuming the Sloanes were doing a proper job, and "at least as well as the average," Pilgrim would have continued their business relationship.

B. Although Pilgrim does not sign a contract until the construction is complete and there were no signed contracts with the Sloanes, if the construction had been completed according to Pilgrim's specifications, Pilgrim would have contracted with the Sloanes to raise chickens.

C. Although it is possible that something could have occurred which would have prevented the placement of the contract, he had never before had that happen.

We find that this evidence does not satisfy the requirements of the *Allied Bank* case. *Allied Bank* states that lost profits may be recovered where the claimant proves the "actual existence" of future contracts from which lost profits can be calculated with reasonable certainty. In this case, there was no proposed form of contract between the Sloanes and Pilgrim introduced into evidence; there was no proof as to any of the specific terms of such proposed future contract from which the jury could award lost profits with reasonable certainty. By contrast, in the *Allied Bank* case the $50,000 commission which would have been earned in the future by C.B.D. was liquidated, which was determined by a contract that actually existed. We believe that the *Allied Bank* court's intent in making the "future contracts" exception was to restate the principle that lost profits cannot be recovered in the absence of a history of profitability unless the claimant proves the actual existence of a specific contract from which future profits can be determined

with reasonable certainty. *See Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340 (1955); *Automark of Texas v. Discount Trophies*, 681 S.W.2d 828 (Tex.App.—Dallas 1984, no writ).

There having been no future contract in existence, we need not examine the testimony of Russell Burks, a neighboring contract feeder with Pilgrim. Burks' testimony attempts to establish profits which the Sloanes would have earned had a future contract existed.

▋ The Sloanes also pleaded that they sustained some loss of profits from the sale of hay, having bulldozed approximately five acres of pasture land in preparation for the erection of the proposed new broiler houses. This was likewise a new and unestablished business. Robert Sloane testified that they had hay cuttings off the pasture last year for the first time. Their hay sales the previous year were unrelated to the hay production he expected in the future.[7] Furthermore, without further explanation, Mrs. Sloane testified that there could be hay profits "[i]f the weather permits"; Robert said hay profits depended upon "what kind of year it was." We find with no past history of profitability and the speculative nature of any hay profits the evidence fails to demonstrate the facts with any certainty that would authorize a recovery of lost hay profits from this new and unestablished business. The Bank's third and fifth points of error are sustained to the extent that they allege that there was no evidence to support the Sloanes' recovery of damages for past or future lost profits.

Since we find that the evidence did not support damages for lost profits, we need not discuss the Bank's fourth point of error pertaining to the right to recover damages for lost profits in a negligent misrepresentation case. Likewise, we need not address the Bank's fifth point of error claiming that "out-of-pocket losses" and "lost profits" are mutually exclusive measures of recovery.

### DAMAGES FOR MENTAL ANGUISH

The jury awarded the Sloanes $15,000 for past mental anguish incurred as a proximate result of the Bank's negligent misrepresentation. By its sixth point of error, the Bank argues that damages for mental anguish are not recoverable in a suit for negligent misrepresentation.

Although damages for mental anguish are independent of damages for pecuniary loss, Texas courts have awarded recovery of damages for mental anguish in a wide variety of negligence actions in which damages were limited to recovery for pecuniary loss. *Kneip v. UnitedBank–Victoria*, 734 S.W.2d 130, 136 (Tex.App.—Corpus Christi 1987, no writ); *Sanchez v. Schindler*, 651 S.W.2d 249 (Tex.1983); *also see St. Elizabeth Hospital v. Garrard*, 730 S.W.2d 649 (Tex.1987) (holding that physical injury no longer an element of the common-law action for negligent infliction of mental anguish); *City of Ingleside v. Kneuper*, 768 S.W.2d 451 (Tex.App.—Austin 1989, writ denied) (allowing recovery for past mental anguish under the Whistleblower Act where city employee was fired for reporting criminal activity in connection with city's building inspections); *City of Watauga v. Taylor*, 752 S.W.2d 199 (Tex.App.—Fort Worth 1988, no writ) (allowing recovery of mental anguish for flooding of property as a result of City's negligent maintenance of drainage ditch); *Kold–Serve Corporation, et al. v. Ward*, 736 S.W.2d 750 (Tex.App.—Corpus Christi 1987, writ dism'd) (allowing recovery for mental anguish where buyer of ice-making machine sued seller alleging breach of contract, breach of warranties and deceptive trade practices).

▋ In a recent case similar to a negligent misrepresentation cause of action, the supreme court denied writ in a suit for damages for mental anguish by a wife and child of a prison inmate who were negligently notified that the inmate had died. *Texas Department of Corrections v. Win-*

---

7. The Sloanes sold a total of 300 to 400 bales of hay the preceding year. They estimated that hay production could be 75 bales per acre per cutting with anticipated three cuttings per year. Therefore, 3,625 bales of hay could be produced over the 25 acres in the hay grass.

*ters,* 765 S.W.2d 531 (Tex.App.—Beaumont 1989, writ denied). We conclude that damages for mental anguish are recoverable in a negligent misrepresentation cause of action in Texas.

Finally, we examine the sufficiency of the evidence to support the jury's award of $15,000 for past mental anguish. In *Moore v. Lillebo,* 722 S.W.2d 683 (Tex.1986), the Texas Supreme Court described mental anguish as "emotional pain, torment and suffering." However, "[m]ental anguish is more than disappointment, anger, resentment or embarrassment although it may include all of these." *Kneip v. United-Bank Victoria,* 734 S.W.2d 130, 136 (Tex. App.—Corpus Christi 1987, no writ) (quoting *Trevino v. Southwestern Bell Telephone Co.,* 582 S.W.2d 582, 584 (Tex.Civ. App.—Corpus Christi, 1979, no writ)).

In the instant case, Mrs. Sloane testified that since the denial of the loan, her husband of 31 years had moved out of their house because he was so angry with her as a result of this transaction. She further testified that since the denial of the loan, she had suffered from and been treated for migraine headaches due to nerves. Additionally, Robert Sloane testified that his nerves were "on the edge all the time," that since the denial of the loan, he was required to work two jobs to make ends meet and that he spent a great deal of time worrying.

The Supreme Court has stated the following with regard to proof of mental anguish without requiring a physical manifestation:

> The problem is one of proof, and to deny a remedy in all cases because some claims may be false leads to arbitrary results which do not serve the best interests of the public. Jurors are best suited to determine whether and to what extent the defendant's conduct caused compensable mental anguish by referring to their own experience.

*St. Elizabeth Hospital v. Garrard,* 730 S.W.2d at 654.

We find that there was sufficient evidence to support the jury's award of $15,000 for past mental anguish. Accordingly, the Bank's third point of error as it relates to the sufficiency of the evidence to sustain the jury's award for past mental anguish is overruled.

We reform the judgment below to provide that the Sloanes recover the sum of $11,427.03 for past monetary losses other than lost profits, and the sum of $5,212.80 [8] for prejudgment interest, and as reformed, affirm those portions of the judgment; and we affirm that portion of the judgment awarding the sum of $15,000 to the Sloanes for past mental anguish damages; otherwise, we reverse the judgment, and hereby render judgment that the Sloanes take nothing as to any award for lost profits, past or future, over and against the Bank.

---

**8.** Interest was calculated based upon the principles set forth in *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549 (Tex.1985); *Voskamp v. Arnoldy,* 749 S.W.2d 113, 124 (Tex.App.— Houston [1st Dist.] 1987, writ denied); and *Bulgerin v. Bulgerin,* 724 S.W.2d 943 (Tex.App.— San Antonio 1987, no writ). Since neither party raised a point of error contesting the time period used by the trial court to calculate interest, error, if any, has been waived. TEX.R.APP.P. 52(a); *Buffalo Marine Service, Inc. v. Monteau,* 761 S.W.2d 416 (Tex.App.—Houston [14th Dist.] 1988, no writ).