939 F.2d 1176
 16 UCC Rep.Serv.2d 681
 RICHTER, S.A., Investments U.S.A.-Richter Corporation,
Richardson B. Gill, Sharon Gill and Gill Wine &
Grape Company, Plaintiffs-Appellees,
Cross-Appellants,
v.
BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION,
Defendant-Appellant, Cross-Appellee.
TESORO SAVINGS & LOAN, Plaintiff,
Richardson B. Gill, et al., Plaintiffs-Appellees, Cross-Appellants,
v.
BANK OF AMERICA NATIONAL TRUST AND SAVINGS ASSOCIATION,
Defendant-Appellant, Cross-Appellee.
 Nos. 89-1925, 90-8110.
 United States Court of Appeals,
Fifth Circuit.
 Aug. 26, 1991.
 
 Daniel W. Bishop, II, Julie A. Springer, Phyllis Pollard, Scott, Douglass & Luton, Austin, Tex., for Richter.
 Aaron L. Jackson, Peter E. Ferraro, Ford, Ferraro, Fritz & Byrne, Austin, Tex., Louis M. Tarasi, Jr., Tarasi, Tierney & Johnson, Pittsburgh, Pa., for Richardson B. Gill, et al. in No. 89-1925.
 Giles & Yeakel, Austin, Tex., Baker & McKenzie, Bruce & Mankoff, Dallas, Tex., Lloyd Lockridge, Austin, Tex., John P. Lilly, Jim K. Choate, Douglas C. Kearney, Choate & Lilly, Dallas, Tex., Luthor T. Munford, Phelps, Dunbar, Marks, Claverie & Sims, Jackson, Miss., for Bank of America Nat. Trust in both cases.
 Phyllis Pollard, Scott, Douglass & Luton, Austin, Tex., Louis M. Tarasi, Jr., John H. Eaton, Tarasi, Tierney & Johnson, Pittsburgh, Pa., Aaron L. Jackson, Peter E. Ferraro, Ford, Ferraro, Fritz & Byrne, Austin, Tex., for Richardson B. Gill, et al., in No. 90-8110.
 Appeals from the United States District Court for the Western District of Texas.
 Before WISDOM, KING, and BARKSDALE, Circuit Judges.
 BARKSDALE, Circuit Judge:
 
 
 1
 In this most unusual Texas lender liability diversity action, the Bank of America National Trust and Savings Association appeals a jury verdict for plaintiffs, as well as the district court's (1) award of attorney's fees to plaintiffs and (2) judgment against the Bank on its counterclaims. And, the plaintiffs appeal the district court's denial of prejudgment interest and the amount of the fees. We AFFIRM IN PART and REVERSE IN PART.
 
 I.
 
 2
 In the early 1980s, Henry Bernabe, a representative of Richter, S.A.--an international vineyard company headquartered in France--came to Texas to pursue opportunities to develop the wine industry. He met Richardson Gill, who was already involved in a winery in Texas. They explored possible locations in Texas for a winery and enlisted the help of Domaines Cordier, S.A., headquartered in France and one of the largest wine distributors in the world. Bernabe, Gill and Cordier representatives decided to locate the winery on land, with vineyards, owned by the University of Texas, and formed GRC, a corporation, in the summer of 1983. In the summer of 1984, they brought in the Sanchez family as additional investors; and a limited partnership was formed: S-G-R-C, Ltd. (SGRC), for Sanchez, Gill, Richter and Cordier.
 
 
 3
 SGRC was formed to lease land and vineyards from the University, construct the winery, and produce, market and sell wine. The limited partners were: (1) Bakersfield Development Corporation, owned by a Sanchez enterprise, Tesoro Savings and Loan Association; (2) Gill Wine & Grape Company, formed by Richardson Gill; and (3) Richter-Cordier Corporation, owned equally by Richter and Cordier. The general partner was SGRC, Inc., owned by Richter-Cordier Corporation, Gill Wine & Grape Company, and Tesoro.
 
 
 4
 As will quickly become evident, the distinction between SGRC, including its general and limited partners, and the persons or entities (Tesoro, Richardson Gill and his wife Sharon Gill, Richter, and Cordier) that owned them is critical. As stated in the Wine Purchase Agreement (WPA) between SGRC and these persons and entities, referenced in the WPA as "purchasers", the purchasers "control[led] all the limited partners of [SGRC] and control[led] all the stock of S-G-R-C, Inc., the sole general partner of [SGRC]."
 
 
 5
 The University had invested more than $7 million in the land and vines. As the vines reached maturity, SGRC was to take over the cultivation and harvesting. Under the lease with SGRC, the University kept title to the grapes until harvest. The initial SGRC business plan called for an initial capital investment of $4 million and for the winery to operate at a loss for several years.
 
 
 6
 SGRC came in contact with the Bank in 1984 in its search for financing. The Bank arranged three lines of credit: (1) a $1 million working capital line of credit, frozen in 1986 at $500,000; (2) a $2.8 million building financing lease; and (3) a $7.2 million equipment lease held by General Foods Credit Corporation (GFCC), backed by a Bank letter of credit. GFCC owned SGRC's equipment, took a tax depreciation deduction and charged SGRC rent. In the event of default, GFCC was entitled to draw against the letter of credit (not only the amount due under the lease, but also an additional amount for tax penalties GFCC would face if it were prematurely forced to surrender its investment).
 
 
 7
 To secure the financing, the Bank and SGRC entered into a credit agreement, a winery credit agreement, a security agreement and a deed of trust. The credit agreement permitted acceleration without notice and required any waiver of default to be in writing; any failure to pay debts to the Bank when due was considered a default.
 
 
 8
 The SGRC partners would not provide an additional form of security desired by the Bank--personal guarantees.[1] Accordingly, as noted, SGRC and the persons and entities that controlled the partners entered into the Wine Purchase Agreement (WPA), which created obligations from Richardson and Sharon Gill, Richter, Cordier and Tesoro (the purchasers) to SGRC. The Bank and the SGRC partners were not parties to the WPA. The WPA provided that if SGRC's net worth dropped below $1.4 million and SGRC did not pay its debts when due to the Bank or GFCC, the purchasers would pro rata purchase up to $5 million of wine from SGRC "in order to enable [SGRC] to meet its Monthly Payment Obligations when due." If wine were not "immediately available," the purchasers agreed to "pre-order and make advance payments" to SGRC. In addition, all WPA proceeds to SGRC were "assigned and [to be] paid directly" to the Bank. And, under the security agreement, the Bank had the right "to demand, receive and ... sue for all moneys payable to [SGRC]."
 
 
 9
 Under the SGRC partnership agreement, all actions required unanimity. The partnership agreement also provided a buy/sell provision which permitted one partner to propose a buy-out to another, who could either accept or elect to buy out the proposing partner on the same terms. Moreover, a buy/sell proposal was subject to approval by both the University and the Bank.
 
 
 10
 The SGRC partnership agreement also provided that the partners would not receive compensation until the company was profitable. However, when a French bank purchased Cordier in late 1984, it requested compensation for its services. This led to problems among the partners and an attempted buy-out by the Cordier successor in early 1985. The University did not approve the buy-out, because it wanted all four partners to remain.
 
 
 11
 Among other problems in late 1985, SGRC's wines were not being marketed, they were unavailable for purchase, and the winery was overbuilt and expensive to operate. A December 31, 1985, audit of SGRC revealed that it was in violation of its loan agreements and "all of the debt could be called for payment in 1986." SGRC met in February 1986 to discuss its problems and consider a change in the partnership structure. It hired a workout negotiator, Don Thomas, to assist in restructuring its financing with the Bank. Thomas advised SGRC that the best way to get the Bank to negotiate would be for SGRC to default on its obligations to the Bank. In April 1986, Thomas met with Bank officials Sadani and Kalp, from Houston, and told them that SGRC would not make further payments "until a restructure acceptable to all parties was made." The Bank responded that the GFCC lease had been in default since January and could be called in May, after 95 days of default.
 
 
 12
 On May 6, 1986, Bernabe met with Sadani and Richard Albright, a senior Bank officer from California who had initially approved the credit. Bernabe told them that Richter was interested in buying out Cordier if the Bank would restructure the financing. The officers advised Bernabe that they were willing to "work with [him] toward a restructuring" if Richter would both bring the GFCC lease current and keep the winery operating throughout the summer. At that time, SGRC owed approximately $320,000 on the equipment lease; but Richter was only liable, as a purchaser under the WPA, for approximately $115,000 of this amount. And, through its partnership interest, it was not obligated to fund SGRC's operating expenses.
 
 
 13
 The next day, May 7, Richter committed to pay (and shortly thereafter did pay) approximately $320,000 to bring the GFCC equipment lease current through April 1986. That amount was credited against its obligations under the WPA. That same day, Bernabe met with SGRC and made a proposal for Richter to buy out the partners. He negotiated specific written agreements with Cordier and Sanchez, under which Richter secured an option to buy their interests if certain conditions were met within 60 days. Bernabe also made an offer to purchase Gill Wine & Grape's interest, but Richardson Gill did not want to sell. On May 9, Bernabe and Sanchez agreed that Sanchez's interest in SGRC would be purchased for approximately $1.5 million. And, on May 29, Bernabe and Cordier agreed that Richter would buy its interest for $1.6 million. The agreements with Sanchez and Cordier in part required Richter to fund the operations during the summer harvest. Bernabe testified that these agreements were a consequence of his discussions with the Bank.
 
 
 14
 Richter created Investments U.S.A.-Richter Corporation to (1) handle the purchase of the partners' interests; and (2) fund the operation of the winery, which it began doing. Bernabe made a formal presentation to the University on May 29th regarding the buy-out. He testified that the University approved the buy-out and business plan, contingent upon the Bank's approval.
 
 
 15
 The Bank had also experienced financial losses in 1985. One response was to restrict its extension of new credit to start up wineries; it issued a Wine Industry Loan Policy memorandum, dated September 1985 and distributed to the SGRC loan officers in February 1986. The Bank also planned to reduce its customer base in 1986 and adopted a classification scheme for existing credits to either "increase, hold, reduce, or disengage."
 
 
 16
 Under this internal system, the Bank in 1986 graded each customer account as one through eight. A one was the highest quality borrower; eight, a loss. If the credit relationship deteriorated or changed, the classification was also changed. Prior to 1986, the Bank classified the SGRC account as a three (acceptable). In January 1986, it down-rated the account to a four (watch list).
 
 
 17
 Kalp testified that the Bank's California headquarters directed the classification change, even though he and Sadani were more familiar with the account. Kalp stated that Sadani, who was the primary account officer, disagreed with the change, because he believed there had been no deterioration in SGRC's financial condition.
 
 
 18
 In April 1986, after Thomas had advised the Bank that SGRC payments would be withheld, the Bank down-graded the account again, to a five (other loan especially mentioned (OLEM)). OLEM was a designation for a credit that had "some weakness to it." A memo attached to the classification change described the Bank's "overriding strategy ... to disengage." Kalp testified that "disengage" was a term used by the Bank to mean "withdraw from a credit, if possible.... But you just can't do that just by saying it."
 
 
 19
 On May 21, 1986, approximately two weeks after (1) its meetings with Bernabe and (2) the GFCC lease being brought current by Richter, the Bank downgraded the SGRC credit a third time, to a six (substandard). A memorandum explaining the change stated that the strategy was to "disengage as quickly as possible." And, in a June 30 follow-up report, the Bank stated that it did not want to "keep this relationship" and would not "take a loss on this credit."
 
 
 20
 Bernabe and the Bank continued their negotiations; and Bernabe submitted a written proposal to the Bank, dated June 12, 1986. At a meeting on July 15, the Bank made an oral counter-proposal. Bernabe was very surprised at the proposal; he thought it was "very hard-line" and "totally unacceptable." However, Sadani called Bernabe and reassured him that the Bank "wanted to do a deal with us." (The Bank later submitted a lengthy written counter-offer, on August 12.) This notwithstanding, Kalp called GFCC on July 16 and requested its consent to terminate the equipment lease. And, on August 14, the Bank issued an internal credit memorandum, which stated that the GFCC lease would be terminated on August 19. However, GFCC refused to give its consent until advised by the Bank that negotiations had failed and stated that in the event of termination, it would "likely ... exercise [its] right to draw under the letter of credit supplements relating to SGRC."
 
 
 21
 In August 1986, the loan was reclassified for the fourth time in eight months--to a seven (doubtful). The credit classification stated that any account could not stay doubtful for more than one quarter. Kalp testified that customers are not informed about the downgrading of their credit.
 
 
 22
 During the summer, Bernabe, through Investments U.S.A., funded the winery operations; hired a wine consultant; formed a team to market the wine; hired new staff for the vineyard; and continued bottling wine. He testified that Albright told him on several occasions that "we're heading [in] the right direction. Things are going well." Gill testified that Kalp told him in August that "there were no deal-breakers and they were going to bridge the gap pretty soon," but that Kalp did not "make any promises."
 
 
 23
 However, Thomas cautioned Bernabe about the Bank's motives and resigned in late August, because his "efforts were being undermined by the private conversations" Bernabe was having with the Bank. Bernabe testified that Bank officers had earlier told him that Thomas was a "road block to successful negotiation." Bernabe also hired an investment banking firm, Underwood Neuhaus, to assist in the restructuring and raise additional capital from outside investors.
 
 
 24
 On September 2, 1986, GFCC drew against the letter of credit in the amount of $7.2 million. Concomitantly, the Bank extended a $7.3 million loan to SGRC on a 30-day basis, extended to October 31, 1986. Also on September 2, Kalp wrote Bernabe that "[w]e remain optomistic [sic] that we can reach an agreement".
 
 
 25
 Internal Bank documents reflect that during September, the Bank prepared to terminate the credit. A September 26 credit memorandum stated that the department of credit administration was involved in an action plan to terminate the leases. The Bank sent draft termination letters to GFCC, with a statement that Kalp proposed to serve them on SGRC at a meeting the week of September 29. The letter declared all sums outstanding under the Winery Credit and Amended and Restated Master Promissory Note due and payable and "demand[ed] delivery of the winery building and all properties including all property subject to the Lease Agreement between the [University]" (foreclosure).
 
 
 26
 The parties could not agree on an acceptable restructuring plan. The Bank did not want Richter to pay cash to either Cordier or Sanchez for their partnership interests and requested warrants, an option to participate in the capital of the company, which Bernabe did not want. Bernabe continued negotiating with Cordier throughout September, but could not reach an agreement, because Cordier required cash.
 
 
 27
 On September 29, Bernabe demanded that Cordier either accept the buy-out proposal or begin financing the winery. On September 30, Bernabe met with Bank officers and told them he could not indefinitely fund the winery and could only continue funding if the Bank would do "something serious with us." From early June through mid-September, 1986, Investments U.S.A. had provided $1,155,500 to SGRC to fund its operations. At the meeting, the Bank officers did not mention terminating the credit or foreclosing. The Bank officers testified that Bernabe had threatened to put SGRC in bankruptcy.
 
 
 28
 On October 1, the Bank officers served termination letters on SGRC, because they could not reach an agreement. According to Bernabe, the officers stated that the Bank would reconsider if Bernabe reached an agreement with the partners within 72 hours. Albright testified, however, that there was no such 72-hour arrangement. Bernabe claimed that he reached an agreement with Cordier and Sanchez within the 72 hours, but that the Bank said it was not interested.
 
 
 29
 The Bank foreclosed; including taking control of the wine and other assets, and operated the winery. During the summer, the Bank had made several demands on the purchasers for amounts due under the WPA. After foreclosure, Richter made demand on the Bank for wine it claimed it was owed under the WPA because of its infusion of funds throughout the summer of 1986, including the payment to GFCC in May, 1986. The Bank refused, also relying upon the WPA and noting, among other things, that SGRC, not the Bank, was a party to the WPA and that the Bank had "no obligation [to Richter] to honor [SGRC's] obligations" under the WPA. The Bank then made another demand for WPA payments. It later sold the winery to Cordier for approximately $9 million.
 
 
 30
 Richter and Investments U.S.A. (Richter plaintiffs); Gill Wine & Grape and Richardson D. Gill (Gill plaintiffs); Sharon B. Gill; and Tesoro brought this suit against the Bank, the University and Cordier. SGRC was not a plaintiff. The Bank counterclaimed for alleged deficiencies under the WPA.
 
 
 31
 Before trial, the University was dismissed and Tesoro and Cordier both settled. As noted, during trial, the district court awarded partial summary judgment to (1) the plaintiffs, holding that the WPA was a contract for the purchase and sale of goods; and (2) the Bank, dismissing the plaintiffs' claim for breach of an implied covenant of good faith and fair dealing. As discussed in section II.D., infra, and at the Bank's request, its WPA counterclaims were withdrawn from the jury. Pursuant to (1) the Bank's post-trial motion on its counterclaims, and (2) the plaintiffs' motion for declaratory judgment on rights and liabilities under the WPA, those claims were adjudicated by the district court after trial, as discussed below.
 
 
 32
 In response to special interrogatories, the jury found against the Bank for (1) breach of an oral contract to negotiate in good faith toward a reasonable restructure of the SGRC debt, (2) fraud, (3) negligent misrepresentation, (4) breach of the WPA and (5) conversion. It awarded approximately $3.3 million in damages, with each party, except Sharon Gill, receiving an award.[2] Although it found malice, it did not assess punitive damages.
 
 
 33
 In post-trial motions, the Bank, inter alia, requested a judgment notwithstanding the verdict (JNOV) and a judgment on the WPA, including on its counterclaims. In the final judgment, the district court ruled on these motions and the plaintiffs' motion for declaratory judgment: it denied the JNOV; declared that Richardson and Sharon Gill and Richter had no liability under the WPA; and dismissed the counterclaims. It also denied plaintiffs' claim for prejudgment interest, but awarded them approximately $630,000 in attorney's fees.
 
 II.
 
 34
 As noted, and as should be clear from the foregoing discussion, this is a most unusual case--procedurally and substantively. It is not a typical lender liability action, to say the least. SGRC, the borrower, is not a party. The plaintiffs are not the borrowers; they are not even the general or limited partners in the partnership, SGRC, which was the borrower; instead, they held some of the controlling interests in SGRC. Furthermore, Bernabe was negotiating not for SGRC, but for Richter. And, at times, he was acting for Investments U.S.A., a Richter entity. Moreover, the Bank's foreclosure and its sale of the winery to Cordier are not in issue.
 
 
 35
 At the outset, we recite the familiar standard for reviewing a jury verdict: it "will not be overturned unless the facts and inferences point so strongly and overwhelmingly in favor of one party that the court believes that reasonable men could not arrive at a contrary verdict." LeBoeuf v. K-Mart Corp., 888 F.2d 330, 332 (5th Cir.1989) (citations omitted). (This standard will be referred to as whether there is sufficient evidence.) Likewise, "it is the function of the jury as the traditional finder of the facts, and not the court, to weigh conflicting evidence and inferences, and determine the credibility of witnesses." Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969) (en banc). In short, our review of the verdict is "constrained by our generous deference to jury findings." Taco Cabana Intern., Inc. v. Two Pesos, Inc., 932 F.2d 1113, 1124 (5th Cir.1991). Of course, we freely review questions of law. E.g., Nealy v. Hamilton, 837 F.2d 210, 211 (5th Cir.1988).
 
 
 36
 The jury found, among other things, that the Bank (1) made fraudulent misrepresentations or promises that were reasonably relied on by the Richter and Gill plaintiffs; (2) made negligent misrepresentations that were justifiably relied on by the same plaintiffs; and (3) entered into, and breached, an oral contract with the plaintiffs to negotiate in good faith toward a reasonable restructure of the SGRC debt. Any of these three findings could serve as a basis for a portion of the damages awarded: (1) $1,155,500 to Investments U.S.A. for "lost funds advanced"; (2) $1,000,000 to Richter for "lost opportunity to sell [its] interest in [the] Partnership"; (3) $75,000 to Richardson Gill for "lost reputation"; and (4) $716,000 to Gill Wine & Grape for "lost equity in or opportunity to sell [its] interest in [the] Partnership." (The jury award of $322,050 to Richter, concerning the WPA, for the "fair market value of lost wine" is discussed in section II.C.)
 
 A.
 
 37
 Because fraud is more difficult to prove than negligent misrepresentation, due to the added element of intent to deceive, we will first consider the finding of negligent misrepresentation. See generally, Blue Bell, Inc. v. Peat, Marwick, Mitchell & Co., 715 S.W.2d 408, 414-15 (Tex.App.--Dallas 1986, writ ref'd n.r.e.). Under Texas law, the elements for negligent misrepresentation are:
 
 
 38
 One who, in the course of his business, profession, or employment, or in a transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
 
 
 39
 Rosenthal v. Blum, 529 S.W.2d 102, 104 (Tex.Civ.App.--Waco 1975, writ ref'd n.r.e.) (quoting tentative draft No. 12, Restatement of Torts (2d) Sec. 552 (1966)). "Furthermore, it is immaterial whether such misrepresentation was made by accident or intent, since it needs only to have been made and to have been false when made." Federal Land Bank Ass'n v. Sloane, 793 S.W.2d 692, 695 (Tex.App.--Tyler 1990, writ granted). The district court's instructions tracked these elements for negligent misrepresentation.[3]
 
 
 40
 The Bank contends (in a footnote) that the district court committed reversible error by failing to instruct the jury on which statements were potentially actionable. At trial, it requested that the jury be instructed that only the following statements could be considered as a basis for negligent misrepresentation: "(a) Promises that Bank of America would negotiate in good faith toward a reasonable restructure of the SGRC, Ltd. loans. (b) Representations that the restructure negotiations were proceeding positively."
 
 
 41
 Instead, the court instructed the jury that a false representation may take three forms: a representation of a past or existing fact; a promise made with a present intent not to perform; or a statement of an opinion made with intent to deceive and "that the bank did not believe the opinion so expressed." We find these instructions were adequate to inform the jury as to which types of statements could serve as a basis for fraud or misrepresentation. It was not reversible error for the court to refuse to submit specific examples to the jury.
 
 
 42
 The Bank maintains that the statements made by the Bank to Bernabe were not of the type which could be justifiably relied upon under Texas law, and alternatively, that there was insufficient evidence to support negligent misrepresentation. The plaintiffs counter that the Bank supplied false information to Bernabe when, in fact, it had already embarked on a disengage strategy from the SGRC credit. They do not assert that they did not default on their SGRC obligations, or that the Bank did not have a right to foreclose. Their argument is that the Bank made representations that induced Bernabe, not SGRC, to pour money into the winery and bring the GFCC payment current. As the court in Sloane noted, "[t]he fact that the Bank had the right to refuse the loan does not bar the Sloanes' right to recover for negligent misrepresentation because this is not an action for breach of contract." Sloane, 793 S.W.2d at 696. (Sloanes conceded that Bank acted reasonably in turning down their request for a loan, but asserted instead that the Bank's representation that the loan application had been approved caused their subsequent reliance and damage.)
 
 1.
 
 43
 We first review the evidence on the Richter plaintiffs' negligent misrepresentation claim. (The Gill plaintiffs' claims are addressed in section II.B.) The first element was that the Bank supplied false information to them. There was evidence that the Bank's actions in preparing to foreclose on the SGRC credit and to adopt a disengage strategy were reasonable and in accordance with sound banking practices; and that it did not supply false information to Bernabe about the possibility of restructuring the SGRC debt.
 
 
 44
 However, the plaintiffs introduced evidence to show otherwise. For example, Gilbert Herrera, an investment banker with the earlier referenced Underwood Neuhaus (retained by Bernabe in the summer of 1986 to assist in the restructuring and obtaining capital), testified that to disengage means to "withdraw from the credit. To get out of the credit.... their documents reflect ... throughout my review it was clear that [that] was their strategy from the very outset." Herrera referred to a Sadani memorandum dated April 15, 1986 which stated that the "[o]verriding strategy is to disengage." This memo was before the key May 6 meeting with Bernabe. He further stated that pursuant to his understanding of disengage, the Bank had determined "that there's no other option except to either foreclose or take over the operation," but that he had never heard the terms disengage or withdraw during his involvement in the summer of 1986 with Richter and the restructuring of the credit.
 
 
 45
 Herrera also testified that in his opinion the Bank did not foreclose much earlier because
 
 
 46
 [the Bank] would only have a lien on the product that was finally produced. Which meant the grapes on the vine had to be cultivated, crushed and bottled. [The Bank], it appeared, would need someone to bridge that gap, to see that the grapes were harvested, which they hadn't been, see them harvested and bottled, so that in fact the bottled wine would be what they had a lien on.
 
 
 47
 The Bank also presented evidence that the course of action it took with regard to SGRC was sound banking practice; it had to prepare for the possibility that SGRC would declare bankruptcy; and it had to protect its depositors. It stressed that the actions it took with SGRC were different and distinct from those with respect to Bernabe. However, there was sufficient evidence for the jury to find that the Bank supplied false information.
 
 
 48
 The plaintiffs also had to prove that the information was given to Richter for guidance in its business transactions. Bernabe testified about the May 6 meeting with the Bank:
 
 
 49
 [W]e would be interested to buy Cordier only if ... they would restructure the loan, because we knew at that time that with the existing credit that we had from Bank of America this business could not be successful.... [a]nd they told us yes they would restructure the loan and they would give authorization for us to buy the Cordier or other partners, provided that we pay--we bring the General Foods lease current. This was a big concern of them at that time. And, of course, that we keep the company afloat for some time. We asked them also how much time it would take and they told us about 60 days to restructure the deal.
 
 
 50
 After this meeting, Bernabe met the next day with the SGRC partners and announced that Richter intended to buy out their interests. And, after meeting with the Bank on May 7, Bernabe sent a letter to General Foods:
 
 
 51
 [T]he purpose of this letter is to apprise you that the undersigned ... has reached a tentative agreement to buy out the other partners in SGRC, Ltd. It is our intention to finance the company in an adequate manner in order to be able to conduct business. As a token of our good faith, I am personally paying the delinquent portion of the lease in the amount of approximately $320,000.
 
 
 52
 By the end of July 1986, Investments U.S.A., through Bernabe, had infused approximately $800,000 into running the winery. And, his August 28 letter to Kalp advised that he had advanced another $200,000. The letter states, in part:
 
 
 53
 You told me that Bank of America is willing to come to an arrangement that would be acceptable to both of us. This can be done only if the company is kept afloat during the time of the negotiation.
 
 
 54
 In response, Kalp wrote: "we continue to negotiate with you regarding a restructuring of the company's debt. We remain optomistic [sic] that we can reach an agreement and look forward to meeting with you on Wednesday, September 3, to continue these discussions." Investments U.S.A. infused additional funds in September. In sum, there was sufficient evidence for the jury to find that the Bank gave information that it intended, knew, or should have known would be used by the Richter plaintiffs in the conduct of business transactions.
 
 
 55
 The more difficult element of proof was justifiable reliance. The Bank maintains that Bernabe could not justifiably rely, because, for example, the Bank did not make any commitment or contract; security agreements gave the Bank the right to accelerate the debt and repossess the collateral without notice once SGRC had defaulted; and the Bank sent regular default notices to SGRC.
 
 
 56
 But, again, the question is whether there was sufficient evidence for the jury to find that Bernabe was justified in his reliance. "A plaintiff may recover for negligent misrepresentation only if he proves 'justifiable reliance' on that misrepresentation.... This requirement, also called the 'materiality' element, has two aspects: the plaintiff must in fact have relied; and this reliance must have been reasonable." Geosearch, Inc. v. Howell Petroleum Corp., 819 F.2d 521, 526 (5th Cir.1987) (applying Texas law) (citations omitted).
 
 
 57
 In addition to the testimony quoted above, Bernabe also testified that he questioned the Bank officers about the default notices and was informed that the demand letters were something "inside their operation." Bernabe was informed that "what was important" was the Bank's negotiations with him. Needless to say, a jury is allowed to make reasonable inferences from the evidence. Although the issue of justifiable reliance is close, we find that there was sufficient evidence for the jury to find that Bernabe justifiably relied on the Bank's representations.
 
 
 58
 Finally, the jury had to find that the Bank failed to exercise reasonable care in communicating the information to the plaintiffs. Concerning the Richter plaintiffs, and as reflected above, there was sufficient evidence for the jury to so find.
 
 
 59
 "Under a less deferential standard of review, our decision might differ, but considering the evidence 'in the light and with all reasonable inferences most favorable' to [the Richter plaintiffs], we cannot say that 'the facts and inferences point so strongly and overwhelmingly in favor of [the Bank] that the Court believes that reasonable [persons] could not arrive at a contrary verdict' " on the issue of negligent misrepresentation. Taco Cabana, 932 F.2d at 1124 (quoting Boeing, 411 F.2d at 374). (Because we uphold the finding of negligent misrepresentation, we need not address fraud. The oral contract issue is addressed in section II.E.)
 
 2.
 
 60
 The jury found that both Richter and Investments U.S.A. suffered injury as a result of the Bank's misrepresentations and awarded damages. Under Texas law, damages must be established with a reasonable degree of certainty. A.B.F. Freight Systems, Inc. v. Austrian Import Service, Inc., 798 S.W.2d 606, 615 (Tex.App.--Dallas 1990, writ denied). "There can be no recovery for damages which are speculative or conjectural." Id. The damages must be ascertainable in some manner other than by mere speculation or conjecture, and by reference to some fairly definite standard, established experience, or direct inference from known facts. Berry Contracting, Inc. v. Coastal States Petrochemical Co., 635 S.W.2d 759, 761 (Tex.App.--Corpus Christi 1982, writ ref'd n.r.e.). Furthermore, "[w]hile mathematical precision is not required to establish the extent or amount of one's damages, one must bring forward the best evidence of the damage of which the situation admits, and there must be some basis for reasonable inferences." Gulf Coast Inv. Corp. v. Rothman, 506 S.W.2d 856, 858 (Tex.1974).
 
 
 61
 Investments U.S.A. was awarded $1,155,500 for "lost funds advanced"--funding the operations of the winery. The amount is not in dispute. At issue is whether that amount was advanced (lost) as a result of wrongful acts by the Bank. As reflected above, entitlement to these damages was proven with reasonable certainty.
 
 
 62
 Richter was awarded $1 million for "lost opportunity to sell [its] interest in [the] Partnership." We find that Richter failed to substantiate this award with the requisite certainty. Bernabe testified that "if I had known that the intentions of Bank of America [sic] was not to negotiate with us, we would have been able to have sold our shares to the other partners and Cordier for $1.6 million"; that "Cordier could have come in any time to buy us out for this amount." And, Herrera testified that he believed Richter had been deprived of an opportunity to sell its interest to Cordier.
 
 
 63
 However, there was no proof that Cordier made an offer to purchase Richter's interest in the partnership prior to foreclosure. Furthermore, Bernabe testified that as of May 6, 1986, "the winery was a white elephant. It was overbuilt, too big, it had cost too much and ... it was not worth the $10 million that we had spent on the winery." He also testified that as of May 1986, the winery "was totally worthless." Bernabe and Herrera's belief that Richter could have sold its interest to Cordier is insufficient evidence of damages.
 
 B.
 
 64
 The jury found for the Gill plaintiffs on the basis of fraud and negligent misrepresentation. As discussed, both require reliance. The jury was instructed that to find fraud, the reliance must be "reasonable"; for negligence, it must be "justified." The district court also instructed:
 
 
 65
 Reliance requires that a person in fact relied on the representation and that this reliance was reasonable. Put another way: There must be a reasonable relation between the contents of the bank's alleged false representation and the action that a particular plaintiff took in reliance on that alleged false representation.
 
 
 66
 Kalp made only one representation to Gill--in late August or September 1986--that negotiations with Richter were proceeding smoothly. The only other evidence was Gill's testimony that he was in contact with Bernabe and relied on what the Bank told Bernabe. Any misrepresentations made were to Bernabe, not to Gill; Bernabe was the one with funds to continue the winery operations. And, Gill admitted that the Bank did not ask him to participate in any undertakings. For example, Gill testified as follows:
 
 
 67
 Q: Now, after the February [1986] board meeting, did you as president of the company ever approach the bank or try to plan to approach them to do the workout, to negotiate the restructure?
 
 
 68
 A: No.
 
 
 69
 Q: And, why was that?
 
 
 70
 A: Well, Henri [Bernabe] was our leader at that point. And Henri had indicated his desire to put his own money into the company to keep it alive. And it was really his ... right to do the negotiating with the bank. He wanted, obviously, to protect his own interests, since he was putting in the money. And I was very happy for a person as able as Henri to be leading the negotiations.
 
 
 71
 But, as stressed by the Richter plaintiffs throughout the trial, Bernabe was not representing SGRC, or its partners, such as Gill Wine & Grape, in these negotiations.
 
 
 72
 We find that the evidence is insufficient to support the jury's finding that the Gill plaintiffs' reliance was either reasonable or justified. Galaznik v. Galaznik, 685 S.W.2d 379, 385 (Tex.App.--San Antonio 1984, no writ) (reliance upon misrepresentation is an essential element of fraud and the evidence of reliance was legally insufficient). And, for the reasons discussed in section II.E., the Gill plaintiffs cannot recover damages on the breach of oral contract claim. Accordingly, all damages awarded to them are reversed.[4]
 
 C.
 
 73
 As noted, the $322,050 Richter paid in May 1986 to bring the GFCC lease current was credited against its obligations under the WPA. Richter sought recovery of this amount under two theories: that the Bank (1) "breached its duty to ... [Richter] to perform under the WPA in good faith" (i.e., to provide wine to Richter in reimbursement for the payment), and (2) "converted wine in which ... Richter had a legal interest." The jury found for Richter on both issues and awarded $322,050 for the "fair market value of lost wine." The conversion issue was presented to the jury only as to Richter; the WPA breach issue, as to all plaintiffs. But for the WPA breach issue, the jury found a breach only as to Richter and Investments U.S.A. Moreover, its award of $322,050 for the value of the lost wine was only as to Richter. Investments U.S.A.'s sole award was the $1,155,500 for "lost funds advanced"; it was not a party to the WPA.
 
 
 74
 The Bank denies liability on either basis; and, as discussed in section II.D., contends that Richter and the Gills (WPA purchasers) are liable to it under the WPA.
 
 
 75
 As noted, the WPA resulted from the partners not giving personal guarantees to the Bank. The parties to the WPA were SGRC and the purchasers: Richardson and Sharon Gill, Richter, Cordier, and Tesoro. Neither the Bank nor the partners were parties. The WPA provided that if the tangible net worth of SGRC fell below $1.4 million and SGRC determined that it could not pay its monthly obligations due under the lease and financing agreements, then each purchaser would purchase wine from SGRC sufficient to cover the deficiency. Furthermore, the WPA provided that
 
 
 76
 [i]f wine is not immediately available for delivery by the Partnership at the time of the occurrence of the two conditions [discussed above] each Purchaser individually will pre-order and make advance payments to the Partnership, at the Partnership's wholesale price for bottled wine at the time of the pre-order, the Purchaser's individual percentage of the quantity of wine necessary to enable the Partnership to pay the deficiency in Monthly Payment obligations. The Partnership will fill such pre-orders out of the next finished wine produced by the winery.
 
 
 77
 (Emphasis added.) The WPA provided that all proceeds to SGRC under the WPA "shall be assigned and paid directly to [GFCC] and [the Bank] to be applied to the Monthly Payment Obligations." Furthermore, in the security agreement, SGRC assigned to the Bank and GFCC its right to WPA proceeds.
 
 
 78
 The Bank contends that it owed no duty to provide wine to Richter, because Richter "never ordered wine from SGRC and so had no right to claim wine from the Bank." As stated, the WPA and the security agreement assigned to the Bank and GFCC rights to proceeds from wine sales or pre-orders; and the security agreement also provided that SGRC had assigned "all monies and rights to payment." Neither document said anything about the Bank or GFCC assuming a duty to provide wine. Under the WPA, SGRC was the entity responsible for providing it. Bernabe testified:
 
 
 79
 Q: You knew that if you wanted to take the wine out of the inventory from SGRC during this period of time to reimburse yourself for the payment you made, you knew that you could do that, didn't you?
 
 
 80
 A: In August probably. Or September maybe.
 
 
 81
 The fact that Richter did not do so does not change the terms of the WPA; SGRC, not the Bank, was responsible for delivering wine to which the purchasers might be entitled.
 
 
 82
 After foreclosure, Richter made demand for wine on the University and Bank:
 
 
 83
 Under the terms of [the WPA], Richter ... is entitled to receive wine equivalent to the sum expended, based upon the [SGRC] wholesale price for bottled wine at the time of each payment. On October 6, 1986, Richter ... advised the University ... and Bank ... that none of the wine owed to Richter, ... had been delivered to Richter.... Richter ... hereby demands delivery by ... October 13 ... of a quantity of wine equivalent to $1,300,000.00 or to any amount which is admittedly due, valued according to the terms of the Wine Purchase Agreement.
 
 
 84
 (Although the Bank had credited Richter's May payment to GFCC against Richter's obligations under the WPA, it had repeatedly informed Bernabe that injections of working capital would not be similarly credited. Likewise, for "the fair market value of lost wine," the jury awarded Richter only the amount it paid to bring the GFCC lease current.)
 
 
 85
 The Bank rejected the demand, noting that the only credit it had granted Richter against the WPA was the May 1986, $322,050 payment to GFCC; that it had no obligation to provide wine in reimbursement for that payment, because it was not a party to the WPA; and that if any wine was owed under the WPA, the claim lay against SGRC, not the Bank. It stated in part:
 
 
 86
 Although the right to receive payments from the partnership was transferred to the Bank as security for the credit extended, the Bank has no obligation to any partner to honor partnership obligations which the partnership itself failed to honor. The sole purpose and intent of the Wine Purchase Agreement was to provide collateral to the Bank.
 
 
 87
 (Emphasis added.)
 
 
 88
 As discussed in section II.D., concerning the Bank's WPA counterclaims, the Bank's refusal to deliver wine, and its stated reasons for doing so, quoted in part above, are quite telling. First, as emphasized in the quoted passage, and as the Bank stated several times earlier in that letter, the Bank took the erroneous position that the WPA "[was] between [SGRC] and each of the partners "; that the "partners [were] required to purchase wine from [SGRC]." (Emphasis added.) But, as noted, it was the purchasers (who controlled the partners), not the partners, that were parties with SGRC to the WPA. Second, the rights and obligations concerning the WPA must, of course, be construed uniformly and consistently in adjudicating the competing and conflicting claims by the parties. Simply put, the parties appear to want it both ways--on the one hand, as discussed in this section, the Bank disclaims any obligation to provide wine, while Richter takes the opposite position; but, on the other hand, as discussed in section II.D., the Bank claims its refusal to provide wine has no bearing on the purchasers' obligations to pay the WPA deficiencies, while they assert that it allows them to repudiate performance.
 
 1.
 
 89
 Richter contends that the use of the word "satisfactions" in the security agreement supports its argument that the Bank was obligated to deliver wine. The agreement provided:
 
 
 90
 Debtor hereby constitutes and appoints Secured Party its true, lawful and irrevocable attorney to demand, receive and enforce payments and to give receipts, releases, satisfactions for and to sue for all moneys payable to the Debtor....
 
 
 91
 (The Bank's right to demand and receive payments under the WPA is discussed in section II.D.)
 
 
 92
 Satisfactions is used in the same sense as the other words with which it is grouped; it means "an entry made on the record, by which a party in whose favor a judgment was rendered declares that he has been satisfied and paid." Black's Law Dictionary 1509 (5th ed. 1979). Its use does not support the plaintiffs' contention.
 
 
 93
 Richter also contends that the Bank expressly assumed SGRC's obligation to provide wine. This is inconsistent with the language of the WPA and the security agreement. Furthermore, under Texas law, an assignment of security does not obligate the assignee creditor to perform the assignor's duties. The U.C.C., Article 2, provides in part:
 
 
 94
 An assignment of "the contract" or of "all my rights under the contract" or an assignment in similar general terms is an assignment of rights and unless the language or the circumstances (as in an assignment for security ) indicate the contrary, it is a delegation of performance of the duties of the assignor....
 
 
 95
 Tex.Bus. & Comm.Code Ann. Sec. 2.210(d) (Vernon 1968). The comments state that this section "lays down a general rule of construction distinguishing between a normal commercial assignment, which substitutes the assignee for the assignor both as to rights and duties, and a financing assignment in which only the assignor's rights are transferred." Uniform Commercial Code Comment 5, Sec. 2.210 Because this assignment was for financing purposes, the presumption that duties were also assigned does not apply.
 
 
 96
 On the basis of the unambiguous contract language, we hold that, as a matter of law, the Bank had no obligation under the WPA to provide wine to Richter. Therefore, there could be no breach of that agreement. See Matter of Topco, Inc., 894 F.2d 727, 738 (5th Cir.1990) (contract interpretation is a matter of law).
 
 2.
 
 97
 In the alternative, Richter claimed that the Bank converted wine in which it had a legal interest. Conversion is "[t]he unauthorized and wrongful assumption of dominion and control over the personal property of another, to the exclusion of or inconsistent with the owner's rights." Waisath v. Lack's Stores, Inc., 474 S.W.2d 444, 447 (Tex.1971) (emphasis added). See also Bures v. First Nat'l Bank, Port Lavaca, 806 S.W.2d 935, 937 (Tex.App.--Corpus Christi 1991, n.w.h.). Consistent with this, the district judge gave a very detailed instruction; and the jury found for Richter.
 
 
 98
 But, even if we assume that Richter did have an interest in the SGRC wine (because it was entitled to its delivery from SGRC in exchange for WPA payments), the Bank also had a lien on wine belonging to SGRC. Bernabe acknowledged this. And, under Texas law, there can be no conversion when a person properly takes pursuant to the terms of a valid security agreement. See, e.g., Montavon v. Alamo Nat'l Bank of San Antonio, 554 S.W.2d 787, 790 (Tex.Civ.App.--San Antonio 1977, no writ). As discussed above, the Bank did so.
 
 
 99
 The court also provided an alternative instruction, on the basis of estoppel: that the Bank would be estopped from denying Richter's legal interest in the wine if it made false material representations to Richter which Richter relied on to its detriment, and, if, in the absence of such representations, Richter would have obtained a legal interest in the wine. However, even if the Bank provided Bernabe with false representations of material facts, that would only serve to allow Richter to possibly meet one element of conversion--that it had a legal interest in the wine. But as discussed above, Richter also had to prove that the Bank exercised "unauthorized ... dominion and control" over the wine. See Waisath, 474 S.W.2d at 447. And, as also discussed above, it failed to do so.
 
 
 100
 Accordingly, we hold, as a matter of law, that the Bank did not either breach the WPA or convert wine belonging to Richter. Therefore, the $322,050 awarded Richter is reversed.
 
 D.
 
 101
 As stated, the Bank had the right to demand, receive and sue for amounts due under the WPA. It made such demands in the summer of 1986 and again after foreclosure; the purchasers refused to make payments. The Bank contends that the district court erred in holding that Richardson and Sharon Gill and Richter had no liability under the WPA, thereby dismissing its counterclaims.[5]
 
 
 102
 As noted, on the third day of the five day trial, the district court granted partial summary judgment for the plaintiffs and the Bank, including holding for the plaintiffs, in a comprehensive opinion, that the WPA was governed by Article 2 of the U.C.C., because it was a contract for the sale of goods. This partial summary judgment resulted from reconsideration of a pre-trial denial of summary judgment by the district judge to whom the case had then been assigned. That denial covered the Bank's counterclaims and the plaintiffs' declaratory judgment claims, all pertaining to the WPA.
 
 
 103
 Both sides rested on the fourth day; and just before the court charged the jury that day, the Bank requested that instructions and special interrogatories concerning its WPA counterclaims be deleted from the charge and verdict form. Its consistent position had been that it was entitled to judgment on the WPA as a matter of law. The request was granted. And on the last (fifth) day, after submission of the case to the jury the day before, the plaintiffs filed identical motions for a directed verdict and for a declaratory judgment, asserting that they had no liability under the WPA and relying in part on the earlier partial summary judgment. Post-trial, the Bank moved for judgment on the WPA.
 
 
 104
 In the final judgment, among other things, the district court denied the Bank's motion for judgment on the WPA. The judgment next provided that the Bank take "nothing on its affirmative claims for relief under the Wine Purchase Agreement. Plaintiffs' Motion for Declaratory Judgment that they had no further obligations to pre-order wine or make purchase payments under the Wine Purchase Agreement is ... GRANTED." In so ruling, the district court did not enter findings of fact or conclusions of law.
 
 1.
 
 105
 The procedure used by the district court and parties is not fully reflected in the record. This, and the lack of findings and conclusions, provoked a classic battle of dueling footnotes here. The Bank (in a footnote in its affirmative brief) contends that the district court's failure to enter them "was an abuse of discretion sufficient in itself to justify reversal of the judgment and remand ... for findings and conclusions on this question." In its responding footnote, Richter asserts, in part, that the Bank's "removal of issues from the jury, along with the failure to request a directed verdict or findings of fact, resulted in a waiver of the Bank's claim which the Bank seeks to resurrect with this appeal." (Its succeeding (footnote) reliance on Fed.R.Civ.P. 49(a) (special verdicts) is discussed infra.) In reply, the Bank asserts that Richter fails to acknowledge that the "Bank moved for judgment on this issue." (However, the Bank fails to note that this motion was filed post-trial.) In the accompanying footnote, it contends, without citation to the record, that "both sides withdrew their jury instructions" on this issue. (Emphasis by Bank.)
 
 
 106
 In its motion for summary judgment, proposed jury instructions, and written objections to the proposed charge, the Bank repeatedly asserted that the district court could enter judgment for the Bank on the plaintiffs' liability under the WPA. Its subsequent withdrawal of its counterclaims from the jury followed on the heels of the adverse partial summary judgment on the WPA. However, it appears that the only item in the record expressly addressing this withdrawal is a post-trial order on motion by the Richter plaintiffs, pertaining to a record being made of several events which occurred during the trial. The order confirms that "immediately before this Court read the Charge to the jury", the Bank, among other things, "requested that instructions and special interrogatories concerning its counterclaim under the [WPA] be deleted from the charge and verdict form...." Moreover, the instructions and interrogatories given the jury do not address the counterclaims. The record is silent concerning the plaintiffs' response, if any, to the Bank's withdrawal request. And, contrary to the Bank's contention, the record does not reflect a similar withdrawal of instructions request by the plaintiffs. However, in their requested instructions, they had included instructions pertaining to the counterclaims and the requested declaratory judgment. Those were not included in the instructions given the jury; nor did plaintiffs object to the jury charge on that point.[6]
 
 
 107
 When the Bank was allowed to withdraw the counterclaims from the jury, it is not known what, if anything, the Bank advised the district court as to its desire for a ruling on its counterclaims. The plaintiffs' motions, including for declaratory judgment, on the last day of trial--the day after the Bank withdrew its counterclaims from the jury and after submission of the case to the jury--were consistent with the Bank's position that the WPA issues were matters for judgment as a matter of law; and the motions were based, in part, on the recent partial summary judgment. Furthermore, the plaintiffs' underlying declaratory judgment claim had been pending since well in advance of trial. That claim, in effect, mirrored the Bank's counterclaims.
 
 
 108
 In sum, it is not clear what transpired. In its reply brief, the Bank asserts that its counterclaims were "an entire cause of action tried to the District Court which was obliged to make findings under Fed.R.Civ.P. 52(a)."[7] But, as discussed, we do not find that the record reflects this. In fact, the silence from the record is deafening. In any event, we hold that this WPA issue, including the Bank's counterclaims, is properly before us. As quoted above from the final judgment, the district court, in effect, disposed of the counterclaims and declaratory judgment claims as one issue. This was a logical follow-up to the partial summary judgment granted during trial. Moreover, consistent with the holding in that partial summary judgment, the Bank expressly "concedes [here] that the WPA is governed by Article 2 of the UCC and the [purchasers] ordinarily would have any defense against the Bank that they would have against SGRC." As discussed infra, the Bank relies, instead, upon the contentions that the purchasers can not assert these defenses, because (1) they are not supported by the evidence; and (2) the purchasers caused the default under which they seek shelter.
 
 
 109
 "Findings of fact and conclusions of law are unnecessary on decisions of motions under Rules 12 and 56 or any other motion except as provided in Rule 41(b) [concerning bench trials]." Fed.R.Civ.P. 52(a). Therefore, the district court was not required to enter them in granting the plaintiffs' motion for declaratory judgment and denying the Bank's motion for judgment on the WPA. But, even assuming that they should have been entered, their absence "does not necessarily require a reversal of the judgment if a full understanding of the issues on appeal can nevertheless be determined by the appellate court." Matter of Texas Extrusion Corp., 836 F.2d 217, 221 (5th Cir.1988); see also, Gupta v. East Texas State University, 654 F.2d 411, 415 (5th Cir.1981). Based on our review of the record, including the testimony, exhibits and comprehensive partial summary judgment opinion, we have the requisite full understanding. In short, we conclude, albeit dubitante, that this issue was not waived and is properly before us; nor is there a need to remand for findings of fact and conclusions of law.
 
 2.
 
 110
 As discussed above: (1) the distinction between the SGRC general and limited partners (SGRC, Inc., Bakersfield Development, Gill Wine & Grape, and Richter-Cordier) and the separate (and controlling) WPA purchasers (Tesoro, Richardson and Sharon Gill, Richter and Cordier) is critical, as is the reason for the WPA--the partners not giving personal guarantees to the Bank; (2) the WPA provided that if certain conditions occurred, the purchasers were to either purchase, or pre-order, wine from SGRC; (3) all rights to WPA payments were assigned to the Bank; (4) the Bank had the right to demand, receive and sue for those WPA payments; and (5) although the Bank acquired a security interest in sales or pre-orders under the WPA, it did not assume SGRC's obligation to provide wine to the purchasers.
 
 
 111
 SGRC's inability to provide wine to the purchasers would constitute an anticipatory repudiation of the WPA, allowing the purchasers to suspend performance of their obligations. See Tex.Bus. & Comm.Code.Ann. Sec. 2.610 (Vernon 1968) ("When either party repudiates the contract with respect to a performance not yet due the loss of which will substantially impair the value of the contract to the other, the aggrieved party may ... suspend his own performance...."). Richter and Gill contend that this doctrine relieved them of their obligations under the WPA.[8] As noted, the Bank concedes that because the WPA is governed by Article 2, the purchasers would ordinarily have the same defenses against the Bank as they would have against SGRC. But, as also noted, the Bank contends that because the purchasers, through their interests in SGRC's partners, controlled SGRC, they "cannot complain that they are not responsible for their obligations to the Bank under the Security Agreement assignment of the [WPA] due to the alleged failure of SGRC ... to provide wine to them, when they are responsible for its failure." In short, it contends that because the purchasers made the decision to not make any more WPA payments (assigned to the Bank), they can not take advantage of SGRC's demise to suspend their WPA obligations.
 
 
 112
 The purchasers, through their SGRC partnership interests, did decide to allow SGRC to default; but, once the Bank foreclosed and began operating the winery, SGRC was unable to perform its obligations. Before foreclosure, the purchasers could receive wine pursuant to the WPA. Bernabe had brought the GFCC lease current and was funding the operations of the winery throughout the summer, allowing it to produce wine. The parties tied performance under the WPA and the security agreement to SGRC's continued operation of the winery. Under the WPA, SGRC was to fill pre-orders from "the next finished wine produced by the winery." The security agreement provided "[t]hat the general nature of the business out of which such accounts and contract rights arise or are to arise is a winery, and such business is or will be carried on at Bakersfield, Pecos County, Texas."
 
 
 113
 Once the Bank foreclosed and began operating the winery, SGRC was unable to provide wine to the purchasers and thereby essentially repudiated the WPA. Under Sec. 2.610, comment 2, "[i]t is not necessary for repudiation that the performance be made literally and utterly impossible. Repudiation can result from action which reasonably indicates a rejection of the continuing obligation." We find that the foreclosure of the winery, if not making SGRC's performance literally impossible, certainly constituted such a rejection of its continuing obligation.[9] Accordingly, the purchasers' performance was properly suspended. As discussed above, the Bank did not assume SGRC's obligation to supply wine pursuant to the WPA, only the right to demand and receive payment. And, after foreclosure, the Bank, in great detail and based upon the terms of the WPA, denied any liability under the WPA, when Richter made demand on it for reimbursement in wine.
 
 
 114
 Obviously, the result would have probably been different if the Bank had received the guarantees it initially sought. If the purchasers, among others, had guaranteed SGRC's obligations, then the foreclosure and the Bank's operation of the winery would probably be irrelevant to the purchasers' obligations as guarantors. However, here, the purchasers' responsibilities were tied directly to SGRC's operation of the winery and their ability to receive wine from it; they did not guarantee the debt. We affirm the district court's dismissal of the counterclaims.
 
 E.
 
 115
 All parties appeal the district court's award of attorney's fees, which "[w]e review ... under the abuse of discretion standard." Rendon v. AT & T Technologies, 883 F.2d 388, 399 (5th Cir.1989). However, under Texas law, "[a]ttorney's fees are not recoverable in an action unless provided for by statute or contract between the parties." Canales v. Zapatero, 773 S.W.2d 659, 660 (Tex.App.--San Antonio 1989, writ denied). Under Texas law, plaintiffs can recover attorney's fees for a successful claim for breach of an oral contract; and the court may award "reasonable and necessary attorney's fees as are equitable and just" for declaratory actions. Tex.Civ.Prac. & Rem.Code Secs. 38.001(8), 37.009 (Vernon 1986).
 
 1.
 
 116
 In order to review attorney's fees for breach of contract, we must first address the substantive issue. As noted, the jury found that the Bank "breached an oral contract ... to negotiate in good faith toward a reasonable restructure of the ... [w]inery debt" with the plaintiffs. However, we hold that even if such an agreement existed, Texas law would not enforce it, because it is too indefinite. And, whether a contract fails on this basis is a question of law. Neeley v. Banker's Trust Co. of Texas, 757 F.2d 621, 626 (5th Cir.1985) (reversing jury verdict under Texas law).
 
 
 117
 The plaintiffs stress that they "are not arguing that the Bank agreed to a specific ultimate outcome of the negotiations. Plaintiffs are arguing that the Bank agreed to negotiate a contract in good faith, regardless of the outcome of the negotiation.... Plaintiffs and the Bank agreed to the method of negotiation, not to the result of the negotiation." (Emphasis by Richter.)[10] But this does not change the nature of this oral agreement as being too indefinite. "If an alleged agreement is so indefinite as to make it impossible for a court to fix the legal obligations and liabilities of the parties, it cannot constitute an enforceable contract." University Nat'l Bank v. Ernst & Whinney, 773 S.W.2d 707, 710 (Tex.App.--San Antonio 1989, no writ). Furthermore, "[t]here is no authority to ask a jury to supply an essential term in the contract which the parties were unable to complete by mutual agreement." Id. See also Bank of El Paso v. T.O. Stanley Boot Co., 809 S.W.2d 279, 285-86 (Tex.App.--El Paso 1991, n.w.h.).
 
 
 118
 Even if we were to find that "good faith" is an objective standard as plaintiffs contend, the agreement is still too indefinite to enforce, because there is no contract term which defines or gives guidance as to what is a reasonable restructure. The only evidence about this oral agreement came from Bernabe:
 
 
 119
 Q: Now I need to ask you the crucial question. Did they promise you that they would restructure the loan.
 
 
 120
 A: They said that yes, they would restructure in a reasonable way. And they would work with us. That's what they said. And the word "reasonable" was used.
 
 
 121
 When asked if the Bank told him that they "would work with you to in good faith reasonably restructure the SGRC loan", Bernabe replied:
 
 
 122
 I can tell you the only word I remember was "reasonable." Because, you know, it kind of clicked.... [A]s far as I'm concerned, sir, when somebody tells me, "Yes, I'm going to do this in a reasonable way," this implies good faith as far as I'm concerned.
 
 
 123
 What is missing from Bernabe's testimony is any discussion of the terms for this agreement, such as duration; the parameters of the Bank's obligations; and what is a reasonable restructure. Bernabe admitted that the conversation was very general on May 6; "we were not very specific. We were talking in general terms, I mean. And there was no need and no means for us to be specific."
 
 
 124
 Here it was Bernabe's "impression" that he had an oral contract with the Bank, but essential terms such as length of the agreement and what constitutes a reasonable restructure are missing. As the court in Wiley v. Bertelsen, 770 S.W.2d 878, 882 (Tex.App.--Texarkana 1989, no writ) noted, it is not enough that a party thinks he has made a contract. And, as in University Nat'l Bank, 773 S.W.2d at 710, the claims made by the Richter plaintiffs are in the nature of breach of a duty in tort rather than breach of contract. We have affirmed the jury's finding of negligent misrepresentation as to them.[11]2.
 
 
 125
 We turn to whether the fees could be awarded for plaintiffs' declaratory judgment. However, the Texas Uniform Declaratory Judgment Act, Tex.Civ.Prac. & Rem.Code Ann. Secs. 37.001-.011 (Vernon 1986), "is not available to settle disputes already pending before the court." B.M.B. Corp. v. McMahan's Valley Stores, 869 F.2d 865, 869 (5th Cir.1989); see Texas cases cited therein. If a declaratory judgment action involves issues already before the court, then the party is not entitled to attorney's fees. Id. "[T]he legislature did not intend to authorize defendants to bring a declaratory judgment action to determine rights already subject to determination in a pending suit." Narisi v. Legend Diversified Investments, 715 S.W.2d 49, 51 (Tex.App.--Dallas 1986, writ ref'd n.r.e.) (discussing Joseph v. City of Ranger, 188 S.W.2d 1013, 1014 (Tex.Civ.App.1945, writ ref'd w.m.)).
 
 
 126
 The same reasoning would apply to a plaintiff amending a complaint to include a declaratory judgment action in response to a defendant's counterclaim raising the same issues. The Bank pleaded its WPA counterclaims in November 1986. As late as February 1988, Richter had never sought declaratory relief; and Richardson Gill had abandoned his original request for it, after the Richter and Gill actions were consolidated. In August 1988, the Richter and Gill plaintiffs amended their complaint to include a request for declaratory judgment on the WPA; but the declaratory relief sought "involve[d] only issues already raised by [an] original claim," the Bank's counterclaims. B.M.B. Corp., 869 F.2d at 869.
 
 
 127
 Therefore, the parties are not entitled to attorney's fees under either breach of contract or declaratory judgment claims. Accordingly, the fee awards are reversed.
 
 F.
 
 128
 All plaintiffs appeal the denial of prejudgment interest. Needless to say, because we have reversed all of the damages awarded, except the substantial award to Investments U.S.A. ($1,155,500), it is the only plaintiff to which this issue applies. The district court held:
 
 
 129
 This Court recognizes that in all but exceptional circumstances, Cavnar v. Quality Control Parking, 696 S.W.2d 549 (Tex.1985), prevailing Plaintiffs should receive prejudgment interest. [See also: Matthews v. DeSoto, 721 S.W.2d 286 (Tex.1986) (per curiam); Concorde Limousines v. Moloney Coachbuilders, 835 F.2d 541 (5th Cir.1987) ]. However, this Court is of the opinion that: (1) the issues and claims of the parties involved close questions and genuine disputes; (2) the jury's awards to the respective Plaintiffs are sufficient to compensate them for any delay in the receipt of monies due them; and (3) Bank of America was not dilatory in joining issue or seeking speedy resolution of the disputed questions involved in this case.
 
 
 130
 As the district court recognized, under Texas law, prevailing parties receive prejudgment interest as a matter of course. Cavnar v. Quality Control Parking, 696 S.W.2d 549 (Tex.1985), modified on other grounds by, Reagan v. Vaughn, 804 S.W.2d 463 (Tex.1990). The plaintiffs contend that Texas has not recognized any exceptions; alternatively, they contend that no exceptional circumstances exist here.
 
 
 131
 As included in the above quoted ruling, the district court relied on Concorde Limousines, where this court held that Texas recognized an "exceptional circumstances" exception to the general rule. 835 F.2d at 549. It appears that Texas has not formally adopted this exception; however, it has not rejected this court's approach. Furthermore, this court's holding in Concorde Limousines was very narrow, recognizing that Cavnar and another Texas Supreme Court case, Matthews v. DeSoto, 721 S.W.2d 286 (Tex.1986), also cited here by the district court, based the award of prejudgment interest "on the equitable grounds that an injured party should be made whole"; that such interest "is not intended to punish the defendant's misbehavior", but is instead to "compensate[ ] the plaintiff for being denied the opportunity to invest and earn interest on the amount of damages." 835 F.2d at 549 (quoting from Matthews, 721 S.W.2d at 287) (emphasis added). Concorde Limousines held that these two Texas cases
 
 
 132
 creat[ed] a regime in which equitable prejudgment interest is awarded as [a] matter of course when the trier of fact finds that damages accrued before the time of judgment. Unless the trial court cannot address through other means any equitable concerns that favor the defendant, reduction in the award of interest, even to the point of elimination, is impermissible under Matthews. In all but these exceptional circumstances, Cavnar requires that prevailing plaintiffs receive prejudgment interest....
 
 
 133
 835 F.2d at 549 (emphasis added).
 
 
 134
 We agree with the district court that this most unusual case falls within the exception to prejudgment interest being awarded as a matter of course. As reflected supra, the determination that the Bank was liable to any plaintiff under any theory was extremely close. Investments U.S.A.'s success is due in large part to the generous deference this court applies, properly so, to jury findings. We hold that this case falls within the exception. Here, the district court was in the best position to determine and address the competing "equitable concerns" that favored the Bank (for example, SGRC stopped servicing its debt to attempt to force a restructure; the funding by Investments U.S.A. was concomitant with the Bank's reaction to that situation). It correctly did so by denying prejudgment interest.
 
 III.
 
 135
 The Richter plaintiffs (Richter and Investments U.S.A.) presented sufficient evidence for a jury to conclude that the Bank was guilty of negligent misrepresentation; but while Investments U.S.A. did prove its damages for lost funds advanced with reasonable certainty, Richter did not similarly prove its damages for lost opportunity to sell its interest in SGRC. Nor would Texas law enforce the alleged oral contract to negotiate in good faith towards a reasonable restructure; therefore, among other things, they are not entitled to attorney's fees for breach of contract.
 
 
 136
 The Gill plaintiffs fail under any claim advanced and are, accordingly, not entitled to damages or attorney's fees.
 
 
 137
 As a matter of law, the Bank did not breach the WPA or convert wine belonging to Richter; therefore, Richter can not recover damages for lost wine.
 
 
 138
 The district court correctly held (1) against the Bank's counterclaims and (2) that the plaintiffs in issue had no further obligations under the WPA. However, because their declaratory judgment request on this issue was in response to the Bank's counterclaims, they are not entitled to attorney's fees for bringing it.
 
 
 139
 Investments U.S.A. is not entitled to prejudgment interest, because exceptional circumstances exist. Accordingly, the award for Investments U.S.A., the only party entitled to damages, remains at $1,155,500.
 
 
 140
 Accordingly, as to the district court's judgment, we AFFIRM (1) the award of $1,155,500 to Investments U.S.A.-Richter Corporation; (2) the denial of prejudgment interest; (3) the denial of the Bank's post-trial motions, including for judgment on the Wine Purchase Agreement; (4) the Bank having no recovery on its affirmative claims for relief under the Wine Purchase Agreement; and (5) the grant of plaintiffs' motion for declaratory judgment. We REVERSE (1) the monetary judgments in favor of Richter, S.A., Richardson B. Gill, and Gill Wine & Grape Company; and (2) the award of attorneys' fees.
 
 
 141
 AFFIRMED IN PART and REVERSED IN PART.
 
 
 
 [1]
 It is not clear whether the Bank wanted the guarantees from the partners or from the more financially sound persons and entities that controlled the partners--the WPA "purchasers". In trial testimony, reference is made to the partners. However, in a partial summary judgment, rendered during trial and concerning, in part, whether the WPA was a guarantee (as then contended by the Bank), the district judge stated:
 It is undisputed that the Bank initially desired each of the Purchasers listed in the WPA, including Richter and the Gills, to guarantee certain debt to the Bank. The Purchasers refused. The Bank then proposed an agreement whereby the Purchasers would either purchase wine or inject cash into the Partnership if wine was not available. The Purchasers again refused. The Purchasers would only agree to purchase wine under the conditions contained in the Wine Purchase Agreement reached.
 (Emphasis added.) In support, the district court cited affidavits by Bernabe and Gill.
 For our purposes, we must, of course, look to the trial testimony. However, whether it was the partners or the separate (and controlling) purchasers that the Bank wanted the guarantees from is not the determinative factor. The determinative factor is that the Bank did not receive the guarantees that, for very obvious reasons, it desired.
 
 
 [2]
 Sharon Gill does not appeal. The jury findings on damages were: Richter--nothing for "lost reputation", $1,000,000 for "lost opportunity to sell interest in Partnership", and $322,050 for "fair market value of lost wine"; Investments U.S.A.--$1,555,000 for "lost funds advanced" (corrected by the judgment to the above discussed $1,155,500); Richardson Gill--$75,000 for "lost reputation", and nothing for "lost equity in or opportunity to sell interest in Partnership"; and Gill Wine & Grape Company--$716,000 for "lost equity in or opportunity to sell interest in Partnership"
 
 
 [3]
 The district court instructed the jury as follows:
 [N]egligent misrepresentation means giving false information for the guidance of others in their business transactions if the person giving the false information fails to exercise reasonable care or competence in obtaining or communicating the information. In order to prove negligent misrepresentation, each plaintiff ... has the burden of proving each of the following five elements:
 
 
 [1]
 Bank of America supplied false information to the plaintiff
 
 
 [2]
 False information was given to the plaintiff for its guidance in its business transactions
 
 
 [3]
 Plaintiff justifiably relied upon the false information
 
 
 [4]
 Bank failed to exercise reasonable care in obtaining or communicating the information
 
 
 [5]
 Plaintiff suffered monetary loss as a direct and proximate cause
 You are instructed that information was given if you find that the Bank intended, knew or should have known the information or opinion would be supplied to the plaintiffs for their guidance in their business transactions.
 
 
 [4]
 As noted, Richardson Gill received $75,000 for "lost reputation"; and Gill Wine & Grape received $716,000 for "lost equity in or opportunity to sell interest in Partnership". The Gill plaintiffs also received approximately $279,000 in attorney's fees
 
 
 [5]
 Gill adopted the Richter position on this issue
 
 
 [6]
 As part of the plaintiffs' damages claims, the jury was instructed on the WPA, but only for the purpose of being asked whether the Bank "breached its duty to any ... [of them] to perform under the [WPA] in good faith." As noted, the jury found a breach as to the Richter plaintiffs
 
 
 [7]
 This contention appears to be inconsistent with the position taken by the Bank in its affirmative brief. As noted, the district court utilized a verdict form, with written interrogatories, more in line with Fed.R.Civ.P. 49(b) than with a Rule 49(a) special verdict. However, in its opening brief, the Bank cites Rule 49(a) as follows, in support of the following statement: "At the close of the trial, the parties withdrew their proposed jury instructions on this [WPA] question and filed cross-motions for judgment by the Court. See Fed.R.Civ.P. 49(a)." In response, Richter, in part, notes that under Rule 49(a), if the court fails, under certain circumstances, to make a finding on an issue of fact omitted from the special verdict submitted to the jury, "it shall be deemed to have made a finding in accord with the judgment on the special verdict." Fed.R.Civ.P. 49(a). In reply, however, the Bank appears to abandon its earlier general reliance on Rule 49(a) concerning the procedure followed, and states that its "counterclaim ... was not an 'omitted' issue under Rule 49(a)"; that, instead, and as noted in the text above, "[i]t was an entire cause of action tried to the District Court," requiring Rule 52(a) findings
 The parties' search for a rule of procedure applicable to the procedure followed at trial can, in part, be attributed to the fact that Rule 50 addresses only motions for directed verdict (Rule 50(a)) and for judgment notwithstanding the verdict (Rule 50(b)).
 In future similar situations, the proposed substantial revisions to Fed.R.Civ.P. 50, submitted by the Supreme Court to the Congress on April 30, 1991, should be of assistance. For example, proposed Rule 50(a) refers to judgment as a matter of law (the term used in Rule 56), instead of motions for a directed verdict. See Communication from the Chief Justice of the United States, Proposed Amendments to the Federal Rules of Civil Procedure, H.R. Doc. No. 102-77, 102d Cong., 1st Sess. (1991); see also, Notes of Advisory Committee on Proposed Rules.
 However, the proposed Rule, in part (a)(2), states that the motion
 for judgment as a matter of law may be made at any time before submission of the case to the jury. Such a motion shall specify the judgment sought and the law and the facts on which the moving party is entitled to the judgment.
 (Emphasis added.) As noted, it is unclear whether the Bank moved for judgment on the WPA before the case was submitted to the jury. Its motion of record was dated, served and filed several days after the verdict and quotes trial testimony.
 
 
 [8]
 In the declaratory judgment motion, Richter asserted the defenses of "frustration of purpose, impossibility of performance, anticipatory repudiation, and inability to provide adequate assurance of performance." On appeal, the plaintiffs focus primarily on anticipatory repudiation
 
 
 [9]
 The Bank asserts that because the winery is still in operation, SGRC could still purchase wine to provide to the purchasers. Needless to say, the entire basis on which the WPA was structured is destroyed. And, among other things, the Bank sold the winery to Cordier
 
 
 [10]
 Plaintiffs contend that the jury could have found an implied in fact contract, which is recognized by Texas law. Among other things, the jury was not instructed on this basis
 
 
 [11]
 The Bank contends that if we find no oral contract, then we must reverse the finding of negligent misrepresentation, asserting that the only reason the expert testimony was allowed was due to the contract claim. Based on our review of the record, we find that it went to other issues. The trial court did not abuse its discretion in allowing it